### EUGENE ROZZELL *v.* STATE OF MARYLAND

[No. 15, September Term, 1968.]

168

 ██

 

 ██

 . ██

 ██

 ██

 ██

 ██

 ██

Decided October 2, 1968.

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*John D. Hackett* and *Edward J. Angeletti* for appellant.

*Alfred J. O'Ferrall, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *John H. Lewin, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

On 19 November 1966 about 1:00 A.M. Officer John M. Worsham, a Baltimore City policeman, responded to a call that a prowler was in the dwelling house at 532 N. Gilmor Street. He was admitted to the premises by the tenant of the first floor apartment. "I heard someone run down the staircase, a loud crash * * * I continued to hear somebody running through a hall. And I went in pursuit up the staircase. At the time I observed a door to a second floor apartment, the rear floor apartment, broken open * * * The door jamb and all was just broken out, like somebody had run full force into it. At this time I run back through the hall, straight through, which I heard in to the rear of this apartment a scuffling noise, and run back in with my flashlight, and as I did I observed the defendant here crouched between the tub, and, the bathtub, it was a sink there and a bathtub next to the window that was in the rear of the apartment." The officer took the appellant into the hall and observed what appeared to be blood on his hands and a "sort of substance on his clothes * * * The substance I believed to be blood was wet, in a wet form." Worsham turned the appellant over to another officer and "* * * went directly to the third floor from the second floor landing, which I had heard someone run down from. As they entered this door, it is a landing that is sort of a U affair, you go up and you hit another little landing, and then back up into the third floor apartment (the only apartment on the third floor). As I passed I observed

a knife, or a part of a butcher knife, it appeared to be, lying on this landing. And I went directly to the third floor. And as I shoved the door to the third floor there, was a little hard opening, then I observed a woman's body lying there. I pushed the door continually open and stepped in. As we never could really get the door completely open without moving her * * * At the time that I went up there was still hearing a groan from the body * * * and she was bleeding profusely and she was cut so bad that when I shined on her I could see a laceration she had in her back, her organs still moving inward and reflexes from the body." The body was warm. An ambulance was summoned but by the time it arrived the woman was dead.

The woman was Etta Spencer, age 62 years, height five feet two inches, weight 120 pounds. The diagnosis in the report of the autopsy findings indicated that she had "multiple (36) stab wounds of the neck, chest, back and arms, with tracks penetrating both lungs, thoracic aorta, hyoid bone and 7th cervical vertebra, and with bilateral hemothorax; * * * contusions, abrasions and lacerations of back, chest, abdomen, neck, arms and scalp; * * * incised wounds (2) of right hand; * * * multiple bilateral rib fractures: (2) Left: 2-7 and 11 (b) Right: 2, 3 and 7." It was the opinion of the Assistant Medical Examiner that "* * * Etta Spencer died of multiple stab wounds of the front and back of the chest. She also had additional multiple stab wounds, bruises, abrasions and lacerations of the neck, chest, abdomen, back, arms and right hand." The manner of death was "Homicide—Stabbed by assailant."

The part of a knife seen by the officer was recovered. It "appeared to be a butcher or a boning knife" with a wooden handle and a V groove in the blade. The blade was broken near the tip and the broken part of the blade was found on the floor by the body. Both parts of the knife, the appellant's clothes and swabbings of the substance on the appellant's hands were examined by the Baltimore City Police Department Crime Laboratory. "Human blood from a person having International Group B blood" was found on the blade attached to the handle. Human blood, insufficient in quantity for grouping, was found on the appellant's shirt and on the front of his jacket. Human blood from a person having International Group O blood was

found on the right front pocket of his pants. Each of his hands contained human blood but there was not a sufficient amount on the swabs to group it. The autopsy report showed that the blood of Etta Spencer was type B.[1]

While waiting for the ambulance Officer Worsham examined the apartment in which the victim was found. "To the front and as you would walk through the apartment, as you were heading east on the north side, there was a door open. There was a room which appeared to be a spare room, and it had clothing strewed all over this room. And, in a disarranged manner, very disorderly manner, the articles in this room. Directly in front was a door that was opened, which would be due east, through this hallway, a door that was open and it had keys in the lock. Behind it there was a chair in a propped, sort of a propped position, that I had to shove aside myself to get through * * * [A]s I went into the bedroom I observed the bed on my left, which would be north, and on the bed there was a telephone which the receiver was on the bed covered by two pillows, and the base of the telephone and the other was lying on the floor, this was to the stretch cord. There was blood on the bed, the bed in a disarranged manner. * * * I went to a window that was open in the center, there was three windows facing east in the building, the window in the center had blood on the window frame. *The sill had blood there* * * * The dresser drawers had blood on the front of same, the dresser drawers in this room, there was on the table, a little end table, there was a can of beer, Pabst Blue Ribbon beer, which was still cool in nature, as you felt it, that was there, on there. Then I proceeded out of this room back through the hallway, and I observed all the way down the hallway * * * blood on the hall, on the floor, on the wall, on the walls, as though there had been some sort of a struggle and somebody that had rolled along this wall, it appeared, all the way to the rear of the building of this third floor apartment. And as I did, there directly ahead of this hall, as you come out of the hall, you come into an open, would be like a foyer affair, directly ahead was a little bathroom.

---

1. According to the expert witness about 40% of the population have B type blood and 40% have O type blood.

* * * There was blood in the bathroom and there was also a screw driver found in the hall as I come back through, and there was blood on the bathroom door, and also on the floor, which appeared as if somebody may have rolled against it and bled as they went in." There was no blood on the kitchen floor. There were two windows in the kitchen, at the rear of the building, and from one of the windows "there was a wiring like chicken wire, a quarter inch wire, mesh wire that had been pulled loose from this one window, the pane of glass was broken out on the lower left, and there was blood on this glass and on the frame." There was "what appeared to be blood" on a water heater by the window where "* * * someone had put their hand or arm on the water heater and smeared across the top." Examination of the premises and articles therein by Crime Laboratory personnel were negative as to fingerprints, "no suitable fingerprints" being found.

The appellant, age 15 years, was charged with the murder of Etta Spencer by an indictment filed 22 December 1966. Counsel was appointed to represent him and at arraignment on 6 January 1967 written pleas of not guilty, not guilty by reason of insanity at the time of the commission of the offense and not guilty by reason of insanity "at this time" were filed. By order of court the same day he was transferred to Clifton T. Perkins State Hospital to be examined and evaluated as to his responsibility "at the time of the alleged commission of the offense" and "as to his mental competency and ability to assist in his own defense." The conclusion set forth in the report of this examination, filed 17 February, was that the appellant was sane at the time of the alleged offense and competent to stand trial. On 21 March, upon petition by defense counsel, the court ordered the examination of the appellant by a private psychiatrist, Dr. James E. Smith, II. As the examination of the appellant by the staff of Clifton T. Perkins was made prior to 1 June 1967, the effective date of Chapter 709, Acts of 1967, which prescribed new tests for competency to stand trial and for responsibility for criminal conduct, the evaluation of him was under the test enunciated in *M'Naghten's Case*, 8 Eng. Rep. 718 (1843), then applied in this State. See *Bergin v. State*, 1 Md. App. 74. Therefore by order of court of 14 July 1967, it was ordered that he

be examined by the Department of Mental Hygiene to determine his competency to stand trial and his sanity at the time of the alleged offense in accordance with the provisions of Chapter 709, codified in Md. Code (1968 Repl. Vol.) as Art. 59, §§ 7-12. The issue of his competency to stand trial was heard on 23 October 1967 and it was the finding of the court that he was competent to stand trial. The case was tried on 1 and 2 November in the Criminal Court of Baltimore before Judge Anselm Sodaro, presiding without a jury. The verdicts of the court were that the appellant was sane at the time of the commission of the crime—"I find that at the time of the commission of the crime he was not suffering from any mental disease or defect; and that he did have substantial capacity to appreciate the criminalities of his conduct, and to conform his conduct to the requirements of the law"—and that he was guilty of murder in the first degree. A motion for a new trial was made and denied on 7 November and the appellant was sentenced to imprisonment for the balance of his natural life. On 8 November he was committed to Patuxent Institution for determination of possible defective delinquency.

On appeal from the judgment the import of the first two questions presented goes to the finding of the trial court that the appellant was competent to stand trial and to its verdict that the appellant was sane at the time of the commission of the offense.[2] He contends that the court erred in its finding as to competency to stand trial and in its verdict of sanity at the time of the commission of the offense.

## COMPETENCY TO STAND TRIAL

In *Strawderman v. State*, 4 Md. App. 689, we discussed the provisions of Chapter 709.[3] We stated that the test for competency of an accused to stand trial is "whether such person is unable to understand the nature and object of the proceedings against him or to assist in his defense" and we found that

---

2. The questions were phrased: "1. Did not the Court err in finding Appellant sane?" and "2. Can a mental retardate be held responsible for his criminal acts?"

3. By § 2 of Chapter 709 its provisions were made applicable to all cases tried or scheduled for trial on and after 1 June 1967.

the procedure was that the lower court, when the issue was before it, shall make such determination "upon testimony and evidence presented on the record." See Code, *supra,* Art. 59, § 7. The lower court here followed this procedure. It had before it and considered the testimony and report of the private psychiatrist who examined the appellant, the report of a psychologist who at the time he examined the appellant was the chief clinical psychologist at Clifton T. Perkins State Hospital, the complete medical records of Clifton T. Perkins State Hospital pertaining to the appellant, the complete file of the Juvenile Court of Baltimore City on the appellant, the complete records of Boys Village and the Victor Cullen Forestry Camp with regard to the appellant, the testimony of the assistant director of Juvenile Probation of Baltimore City, the testimony of a case worker of the Victor Cullen School, the testimony of a social worker at Boys Village (all produced by the appellant) and the testimony of the psychiatrist at Clifton T. Perkins who examined the appellant pursuant to the order of 14 July 1967 (produced by the State). With this testimony and evidence before it the lower court held its decision *sub curia* until the next day, stating, "I will spend the balance of my time until tomorrow, but most of it, I suppose, in the study and the evaluation of these reports and all the testimony that has been offered." The lower court applied the testimony and evidence to the test for competency to stand trial:

> "I have reviewed and carefully considered all of the testimony, including the exhibits which were offered at the hearing, in connection with the determination of competency of the defendant Eugene Rozzell to stand trial. And I have given particular attention to the testimony of Dr. James E. Smith, the second, the psychiatrist who expressed the opinion that he had serious doubts as to the defendant's competency to stand trial. As opposed to this evidence there was testimony offered by Dr. James A. Addison, psychiatrist affiliated with the Clifton T. Perkins State Hospital, where the defendant has been confined since August 4, 1967, on the order of Court to examine, evaluate and determine the responsibility of the defendant for

the alleged commission of the offense with which he has been charged. And as to his mental competency and ability to assist in his own defense.

Dr. Addison's expert opinion, which was supported by five other physicians attached to the hospital staff, was clear and unequivocal, that after considerable observation of the defendant's behavior at the hospital, clinical examination of the accused, as well as after a careful conference of the hospital staff, that the defendant, pursuant to Article 59, Section 7 of the Annotated Code of Maryland, was competent to stand trial; and that he was able to understand the nature and object of the proceedings against him, and to assist in his defense.

The Court is compelled by this latter persuasive testimony, and is of the conclusion, and so find the defendant is mentally competent to stand trial; and, does have the ability to assist in his own defense, notwithstanding his low intelligence quotient as reported by Mr. R. P. Oropollo, psychologist attached to the hospital staff."

In *Strawderman v. State, supra,* we said, with regard to competency to stand trial, that the lower court, in whom the determination of the matter rests, must determine beyond a reasonable doubt that the accused is able to understand the nature or object of the proceedings against him and to assist in his defense. In the instant case there was direct expert evidence and other credible evidence from which a rational inference could be drawn sufficient for the lower court to find beyond a reasonable doubt that the appellant was competent to stand trial. Therefore its judgment on the evidence was not clearly erroneous. Md. Rules, 1086. That there may have been evidence to the contrary did not compel the lower court to reach a different conclusion, for the weight of the evidence is a matter for the trier of facts. *McRae v. State,* 3 Md. App. 388. We find no error in the ruling that the appellant was competent to stand trial.

### RESPONSIBILITY FOR CRIMINAL CONDUCT

The test of responsibility for criminal conduct is clearly set

forth in Chapter 709, Acts of 1967, codified in Code, *supra,* Art. 59, § 9(a) :

> "A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

In *Strawderman v. State, supra,* we enunciated the rule which is here applicable :

> "(1) a man is presumed to have been responsible for criminal conduct and sane at the time of such conduct until, after the filing of a proper plea, there is adduced proof that he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law as a result of mental disease or defect ('mental disease or defect' do not include an abnormality manifested only by repeated or otherwise anti-social conduct) sufficient to raise a doubt as to his sanity as defined in the minds of reasonable men, and (2) when there has been offered proof of insanity so defined sufficient to overcome the initial presumption of sanity of the accused the State must prove sanity, as well as the other elements of the offense, charged beyond a reasonable doubt."

On the issue of the sanity of the appellant at the time of the commission of the alleged offense, the defense produced the testimony of the former chief clinical psychologist of Clifton T. Perkins and his report (his diagnosis was that the appellant was "socio-pathic personality, dis-socio type, chronic brain syndrome;" a Wechsler Intelligence Scale examination showed an intelligence quotient of 65 verbal, 44 performance and 51 full

scale indicating intellectual functioning to be within the moderately defective range of intelligence; [4] he could not determine that the appellant had psychosis or mental disease) ; the testimony of the private psychiatrist (his conclusion was that the appellant lacked "substantial capacity to appreciate the criminality and consequences of his behavoir and that he also has substantial incapacity to conform his behavior to the requirements of law;" the conclusion was "based on the appellant's mental defect and his mental disease in the form of a severe character disorder") ; and, it appears, the complete file pertaining to the appellant from Clifton T. Perkins. The lower court found that there had been offered proof of insanity sufficient to overcome the initial presumption of sanity and required the State to offer evidence of sanity. The State produced Dr. James A. Addison of the staff of Clifton T. Perkins. He testified that an examination and evaluation of the appellant had been made at the Hospital and that it was his opinion and the unanimous opinion of the staff that under the test prescribed by Code, *supra,* Art. 59, § 9 that the appellant was responsible at the time of the alleged offense—that "he did not have a mental illness causing him to lack a substantial capacity to appreciate the criminality of his conduct and to conform to the requirements of law."

At the conclusion of all the evidence the lower court, noting that it had carefully considered all the medical testimony in the case, including the exhibits which were offered in evidence, and remarking that it "obviously * * * was confronted with a conflict in the expert testimony," announced its findings :

> "I find that the weight of persuasive expert testimony compels the Court to find beyond a reasonable doubt and to a moral certainty that the defendant was responsible for his criminal conduct, and was sane at the time of the commission of this crime. I find that at the time of the commission of the crime he was not suffering from any mental disease or defect; and that he did

4. According to the witness the terms now used are "borderline mildly defective, moderately defective and severely defective" to indicate intellectual functioning; another classification of deficiency is educable and trainable.

have substantial capacity to appreciate the criminalities of his conduct, and to conform his conduct to the requirements of the law. I also find that he is sane now."

We think that there was evidence before the lower court sufficient for it to find beyond a reasonable doubt that the appellant was sane at the time of the commission of the alleged offense. Thus its judgment on the evidence was not clearly erroneous. Md. Rules, 1086. On appeal the argument of the appellant in claiming that the court erred is directed toward both the determination that he was competent to stand trial and the finding that he was sane at the time of the commission of the alleged offense. He urges that the private psychiatrist was better qualified by experience and education than the psychiatrist from Clifton T. Perkins. He characterizes the clinical psychologist as "confusing at best," the psychiatrist from Clifton T. Perkins as "unbelievably unintelligible," the private psychiatrist as ambivalent on the insanity definition. He complains of the "paucity of time" spent by all psychiatrists in interviewing the appellant.[5] He makes the bald assertion that a "psychiatric staff conference * * * in effect rubberstamps the findings of their colleagues." [6] But these matters, whatever their value, go

5. He also states in his brief that "there was no evidence in the case showing physical test to determine the existence of organic brain damage." We note that the private psychiatrist, called by him, said that among the reports from Clifton T. Perkins State Hospital was a report of an electro-encephalogram.

6. It would appear that the substance of the appellant's argument amounts to an attack on psychiatry in general and at least some of those practicing it. In his brief the appellant quotes from *Contemporary Criminal Hygiene*, Oakridge Press, 1946; page 13; asking "Could Lukos (sic) have been right when he said: 'To hell with all psychiatry. You have brains, gentlemen of the jury. Be your own psychiatrist. Apply your own common sense.'" The quote appears in the work referred to in Chapter One, entitled, "Random Thoughts on the Attitude of the Legal Profession toward Psychiatry" by Edwin J. Lucas, Executive Director, Society for the Prevention of Crime. Lucas ascribes the quote to a member of the New York Bar, fulminating against two psychiatrists who, in a murder trial, offered diametrically opposed views concerning the "insanity" of his client.

at best to the weight of the evidence and the credibility of the witnesses, which are for the trier of facts.

The appellant complains that this State, "by statute has no provision for the determination of mental retardation in a criminal case" and asked, "Can a mental retardate be held responsible for his criminal acts?" [7] It is correct that the statutory provisions for confinement to an institution by reason of mental retardation are not applicable to responsibility for criminal conduct.[8] But assuming, without deciding, that "mental retardation" is encompassed within the terms "mental disease or defect," we note that the appellant was examined by a clinical psychologist and that information as to his intellectual deficiency was before the examining psychiatrists and the lower court.

We find no error in the determination of the lower court that the appellant was sane at the time of the commission of the alleged offense.

## THE SUFFICIENCY OF THE EVIDENCE

The third and last question presented is whether the evidence was sufficient to sustain the conviction.

The appellant concedes that the *corpus delicti* was proved. He does not contend that the homicide was not murder in the first degree.[9] He urges, however, that the evidence was not sufficient to prove the criminal agency of the appellant. He argues, in effect, that the State failed to prove his criminal agency to an absolute or mathematical certainty, but this is not required. See *Lambert v. State,* 193 Md. 551. The circumstances under which the appellant was apprehended on the premises where the crime was committed, evidence indicating that the stabbing

---

7. The appellant states that, "in Maryland, one must be found to be 'idiot' before he is classed as mentally retarded," citing Art. 59, § 31 of the Code. But Chapter 414, Acts of 1966, among other substitutions, substituted "mentally retarded" for "idiotic" and "mental retardation" for "idiocy".

8. See Md. Code (1968 Repl. Vol.) Art. 59, § 31.

9. We think it clear that the evidence herein summarized supported a verdict that the homicide was murder in the first degree, both as wilful, deliberate and premediated, Md. Code (1967 Repl. Vol.) Art. 27, § 407 and as committed in an attempt to perpetrate a burglary, § 410.

had occurred immediately prior to the appellant's apprehension, the finding of the part of the knife on the landing and the broken tip of its blade near the body of the victim, the presence of wet, fresh blood on the hands of the appellant and blood stains on his shirt and jacket, the presence of blood on the knife blade of the same blood group as that of the victim—this evidence and rational inferences therefrom were legally sufficient for the lower court fairly to be convinced beyond a reasonable doubt that the appellant committed the murder. *Eley v. State,* 4 Md. App. 230. Thus we cannot say that the judgment of the court on the evidence was clearly erroneous and may not be set aside. Md. Rules, 1086.

*Judgment affirmed.*