# TYRONE ANTHONY JOLLEY *v.* STATE OF MARYLAND

[No. 118, September Term, 1977.]

*Decided April 7, 1978.*

354

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

We review this case upon our grant of a writ of certiorari before decision by the Court of Special Appeals. The appeal to the intermediate appellate court was by Tyrone Anthony Jolley from an order of the Circuit Court for Dorchester County issued upon a finding that Jolley was incompetent to stand trial in a criminal cause.

# I

The threshold question is whether an immediate appeal lies from the order. The State did not file a motion to dismiss but argued in its brief that the appeal was not allowed by law. Maryland Rule 835 a 1. We find that the appeal was properly taken and shall not dismiss it.

It is the position of the State that "an order which judicially determines the mental incompetency of an accused to stand trial in a criminal case is not an appealable order." The basic reason for the State's position is that the order was not a final one.

Appellate jurisdiction in both civil actions and criminal causes is dependent upon a statutory grant of power. *Lohss and Sprenkle v. State,* 272 Md. 113, 116, 321 A. 2d 534 (1974). With exceptions not here relevant, Maryland Code (1974) § 12-301 of the Courts and Judicial Proceedings Article permits a party to appeal from a final judgment entered in a criminal case by a circuit court. "Final judgment" is defined by § 12-101 (f) of the Article to mean "a judgment, decree, sentence, order, determination, decision, or other actions by a court ... from which an appeal, application for leave to appeal, or petition for certiorari may be taken." "This section, however, does not attempt to specify what is an appealable final judgment or order, and leaves that determination to the case law." *Warren v. State,* 281 Md. 179, 183, 377 A. 2d 1169 (1977). Our cases have held that "to be final a judgment must actually settle the rights of the parties ... or it must finally settle some disputed right or interest of the parties. . . ." *Id.* at 183. We observed as early as 1835: "It is time enough for a party to apply to this Court for redress, when it is ascertained that he is to be injured by the judgment of which he complains." *Boteler & Belt v. The State,* 7 G. & J. 109, 113 (1835). We declared: " '[N]o appeal can be prosecuted to this Court, until a decision has been had in the Court below, which is so far final, as to settle, and conclude the rights of the party involved in the action, or denying to the party the means of further prosecuting or defending the suit.' " *Id.* at 113. We expressed our accord with this view as recently as last year. *Warren,* 281 Md. at 183; *United States Fire Ins. v. Schwartz,*

280 Md. 518, 521, 374 A. 2d 896 (1977). The purpose of this general rule is, of course, to prohibit piecemeal disposition of litigation. *Warren* at 183. It enables the combining in one review all stages of the proceeding that effectively may be reviewed and corrected if and when final judgment results. A well recognized corollary to the general rule, however, permits an appeal from a seemingly interlocutory order which denies an absolute constitutional right, *Neal v. State,* 272 Md. 323, 325, 322 A. 2d 887 (1974). A qualification of the corollary is that an appeal will not lie from an apparently interlocutory order, even though it denies a constitutional right, if the order is based upon the rightful exercise of a trial court's discretion. *Pearlman v. State,* 226 Md. 67, 71, 172 A. 2d 395 (1961). *See Neal* at 325.

An accused has an absolute constitutional right to a speedy trial both under the Sixth Amendment to the Constitution of the United States, applicable to the states through the Fourteenth Amendment, *Klopfer v. North Carolina,* 386 U. S. 213, 222-226, 87 S. Ct. 988 (1967), and under Article 21 of the Declaration of Rights of the Constitution of Maryland. *Jones v. State,* 279 Md. 1, 6, 367 A. 2d 1 (1976), *cert. denied,* 431 U. S. 915 (1977); *Smith v. State,* 276 Md. 521, 526-527, 350 A. 2d 628 (1976). Whether or not the refusal of a trial court to dismiss a criminal cause because of an alleged denial of the right to a speedy trial is immediately appealable,[1] it is manifest that under the rationale of *Neal, supra,* and our other decisions, an appeal will lie from a denial to an accused of the opportunity to assert this absolute constitutional right. The determination by a trial court that an accused is incompetent to stand trial effectively precludes him from *invoking* the right to a speedy trial. The matter of incompetency *vel non* does not come within the qualification of the corollary to the general rule because there is no

---

1. *See* Erbe v. State, 276 Md. 541, 553 n. 1, 350 A. 2d 640 (1976); Jones v. State, 241 Md. 599, 601, 217 A. 2d 367 (1966); Harris v. State, 194 Md. 288, 294, 71 A. 2d 36 (1950). *Compare,* Brady v. State, 36 Md. App. 283, 286-289, 374 A. 2d 613 (1977); Taylor v. State, 22 Md. App. 370, 374, 323 A. 2d 648 (1974). The resolution of this point is pending before this Court in Stewart v. State, No. 78, September Term, 1977, argued 6 January 1978, and before the Supreme Court of the United States in United States v. MacDonald, No. 75-1892, argued 9 January 1978.

exercise of judicial discretion in the court's determination whether an accused is incompetent to stand trial. If the evidence is not sufficient for the court to find beyond a reasonable doubt that the accused is able "to understand the nature of the object of the proceeding against him or to assist in his defense," Maryland Code (1957, 1972 Repl. Vol.) Art. 59, § 23, the court must find him incompetent to stand trial. *Raithel v. State,* 280 Md. 291, 297, 372 A. 2d 1069 (1977). A decision that an accused is incompetent to stand trial appears to fall in that small class which finally determines claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. *See Cohen v. Beneficial Loan Corp.,* 337 U. S. 541, 546, 69 S. Ct. 1221 (1949).[2] Like the order in *Cohen,* the order here is a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it; it does not make any step toward final disposition of the merits of the case and will not be merged in final judgment. What the Court said in *Cohen* is applicable here: "When that time comes, it will be too late effectively to review the present order, and the rights conferred by the [constitutions] . . . will have been lost, probably irreparably. We conclude that the matters embraced in the decision appealed from are not of such an interlocutory nature as to affect, or to be affected by, decision of the merits of this case." *Id.* at 546. We hold that the challenged order is appealable.[3]

2. Under a federal statute an appeal may be taken from an order of a federal district court denying a corporation's motion that the plaintiff in a stockholder's derivative action be required, pursuant to a state statute, to give security for reasonable expenses of the defendants, in connection with the action. Cohen v. Beneficial Loan Corp., 337 U. S. 541, 69 S. Ct. 1221 (1949) held that such an order was immediately appealable. Although *Cohen* is factually disparate, its rationale is apposite.

The *Cohen* rationale was applied in Higgins v. United States, 205 F. 2d 650, 652 (9th Cir.), *cert. denied,* 346 U. S. 870 (1953), in holding that a finding that an accused was incompetent to stand trial was a final order subject to appeal.

3. For cases holding that an order or ruling that an accused was *insane* at the time of trial was appealable prior to a final judgment as to his guilt or innocence for the crime charged, *see* Higgins v. United States, 205 F. 2d 650 (9th Cir.), *cert. denied,* 346 U. S. 870 (1953); People v. Brown, 62 Cal. 2d 901, 42 Cal. Rptr. 837, 399 P. 2d 373, *appeal dismissed,* 380 U. S. 521 (1965); People v. Fields, 62 Cal. 2d 538, 42 Cal. Rptr. 833, 399 P. 2d 369, *cert. denied,*

The State suggests that the statutory scheme embodied in the Mental Hygiene Law, Maryland Code (1957, 1972 Repl. Vol.) Art. 59, §§ 1 *et seq.,* whereby the propriety of the involuntary confinement of a person in a facility by reason of a mental disorder so as to require in-patient medical care and treatment for the protection of himself and others, § 12, may be reviewed by way of habeas corpus, § 14, or by petition filed in an appropriate equity court, with right of appeal from decisions on such petitions as in other equity cases, § 15, supplants any right of immediate appeal from an order declaring an accused incompetent to stand trial in a criminal cause. The short answer is that the involuntary admission of a person under § 15 is an entirely different proceeding than commitment in a criminal cause by the trial court upon a determination of incompetency to stand trial pursuant to § 23. The mere fact that the limitation as to frequency of reconsideration of competency to stand trial is the same as that with regard to a petition for release of a person confined under a § 15 procedure, does not preclude the right to the immediate appeal which we have found is enjoyed by an accused found incompetent to stand trial.[4]

---

382 U. S. 858 (1965); People v. Lindsey, 20 Cal. App. 3d 742, 97 Cal. Rptr. 872 (1971); People v. Little, 44 Ill. 2d 267, 255 N.E.2d 447 (1970); State v. Gremillion, 247 La. 1108, 176 So. 2d 394 (1965); State v. Yaun, 237 La. 186, 110 So. 2d 573 (1959); State v. Hebert, 187 La. 318, 174 So. 369 (1937); Commonwealth v. Ragone, 317 Pa. 113, 176 A. 454 (1935). *Contra, see* People v. Sepanek, 2 Ill. App. 3d 437, 275 N.E.2d 926 (1971); People v. Williams, 131 Ill. App. 2d 507, 266 N.E.2d 145 (1970); People v. Ross, 344 Ill. App. 407, 101 N.E.2d 112 (1951); People v. Cornelius, 332 Ill. App. 271, 74 N.E.2d 900 (1947); Lang v. State, 238 Miss. 677, 119 So. 2d 608 (1960); State v. Hunt, 47 Ohio St. 2d 170, 351 N.E.2d 106 (1976); Cogburn v. State, 198 Tenn. 431, 281 S.W.2d 38 (1955); Crocker v. State, 60 Wis. 553, 19 N. W. 435 (1884).

It is generally held that an order or ruling that the accused was sufficiently *sane* to stand trial is not an appealable order prior to a final judgment as to his guilt or innocence for the crime charged. *See* United States v. Bendicks, 439 F. 2d 1120 (5th Cir. 1971); Watson v. State, 229 Ga. 787, 194 S.E.2d 407 (1972); People v. Bechtel, 297 Ill. 312, 130 N. E. 728 (1921); Desho v. State, 237 Ind. 308, 145 N.E.2d 429 (1957); State v. Aumann, 236 N.W.2d 320 (Iowa 1975); Kilgore v. Commonwealth, 310 Ky. 826, 222 S.W.2d 600 (1949); State v. Burrows, 250 La. 658, 198 So. 2d 393 (1967); Inskeep v. State, 35 Ohio St. 482 (1880); Alexander v. State, 71 Okla. Crim. 47, 107 P. 2d 811 (1940); Commonwealth v. Novak, 384 Pa. 237, 120 A. 2d 543, *cert. denied,* 352 U. S. 825 (1956); Griffin v. State, 29 S.W.2d 349 (Tex. Crim. App. 1930).

*See generally,* Annot. 16 A.L.R.3d 714 (1967).

4. Maryland Code (1957, 1972 Repl. Vol.) Art. 59, § 15 (g) provides: "Once a patient has had a determination on the merits of any one petition filed by him pursuant to this section, no subsequent petition prepared by or for him

## II

This is not merely another case in which the central issue is the competency of the accused to stand trial. It has an unusual twist. Ordinarily the accused is aggrieved because the trial court determined that he was competent to stand trial which then proceeded to conviction. The accused here is aggrieved because the trial court found him to be incompetent and refused to allow the trial to proceed. Jolley insisted that he was able "to understand the nature of the object of the proceeding against him and to assist in his defense." Maryland Code (1957, 1972 Repl. Vol.) Art. 59, § 23. *See Raithel v. State,* 280 Md. 291, 297-300, 372 A. 2d 1069 (1977). He claims that the court erred in determining otherwise.

It all started with Jolley's arrest on 2 September 1976 on charges of assault, battery, assault with intent to murder and grand larceny, alleged to have occurred the day before. Upon petition by Jolley's attorney, the District Court for Dorchester County on 2 September 1976 ordered that Jolley be committed to Clifton T. Perkins State Hospital (Perkins) to determine whether he was competent to stand trial. On 5 October Perkins reported to the court that "[i]t was the opinion of the medical staff that further psychological testing and further observation of Mr. Jolley's behavior was necessary in order to answer the question of his competency to stand trial." Estimating that "an accurate report of his competency can be rendered to the Court within the next thirty days," Perkins suggested that "if a plea of not guilty by reason of insanity is to be entered in Mr. Jolley's defense, that it be entered promptly so that we could evaluate his mental state at the time of the alleged offenses during this present hospitalization in order to avoid the necessity of Mr. Jolley's being hospitalized for this evaluation in the future." On 18 November Perkins reported that it was the opinion of

---

shall be heard by a court of equity within one year of such prior determination, unless, in addition to all other required data, the petition is accompanied by a valid affidavit showing improvement of the patient's mental condition subsequent to the trial." Section 24 prescribes: "The court [in the criminal cause] may at any time upon suggestion of the accused or upon its own motion and subject to the limitations as to frequency contained in § 15 (g), reconsider the question of the accused's competency to stand trial."

the medical staff that "at the present time the patient is able to understand the nature and object of the proceedings against him and to participate in his own defense." Feeling that Jolley was not "in need of inpatient psychiatric care at this time," Perkins returned him to the custody of the court.

On 8 February 1977 a criminal information was filed in the Circuit Court for Dorchester County charging Jolley with assault (1st count), battery (2nd count), assault with intent to murder (3rd count), and grand larceny (4th count). On 10 March Jolley pled not guilty and, pursuant to Code (1957, 1972 Repl. Vol.) Art. 59, § 25, alleged "that he was insane at the time of the commission of the alleged crime and, therefore, pleads not guilty by reason of insanity." On 16 March he filed a preliminary motion for a hearing to determine his competency to stand trial, referring to an opinion of Talmage Reeves, M.D., a practitioner in psychiatry, who had examined him and found that he was incompetent to stand trial. The hearing was held on 26 April 1977.

The 18 November 1976 report of Perkins in which Jolley was stated to be competent to stand trial was given after Jolley had "received a comprehensive psychiatric evaluation and other pertinent studies," the details of which were not set out. The report read:

> "On November 5, 1976, Mr. Jolley was presented before a Medical Staff Conference at which time he was interviewed and his case reviewed. The patient evidenced many symptoms of schizophrenia, including evasiveness, suspiciousness, flat affect and occasional inappropriate mannerisms. It was the unanimous impression of the medical staff that the diagnosis is schizophrenia, paranoid type.
> The medical staff expressed the further opinion that this patient's mental condition is one which has been present for some time and is in stable, controlled status."

Jolley offered Dr. Reeves' report in evidence.[5] The report

---

5. The State's Attorney proffered to the court: "I am personally familiar with Dr. Reeves and have been for many years, and he is a practicing

gave in letter form, addressed to Jolley's attorney under date of 7 February 1977, a psychiatric evaluation of Jolley made at the attorney's request. Dr. Reeves had interviewed Jolley's mother, father, older brother, and, on 5 February, Jolley himself "at length." "The patient was extremely difficult to interview in that he was very evasive and repetitive in his remarks." After giving a detailed account of his interviews with Jolley and Jolley's family,[6] the report went to the heart of the matter:

> "Mr. Jolley was evaluated at Clifton T. Perkins Hospital Center in the fall of 1976. They had a difficult time with their evaluation in that Mr. Jolley was also extremely evasive with them. They sent out an initial examination and asked for an increase in the time for a complete evaluation. For the most part I agree with their diagnosis. Young Mr. Jolley does present himself as a psychopath or anti-social personality and also he is very definitely psychotic at the present time with a diagnosis of schizophrenia. However, in no way can I agree that he is capable of helping in his defense in that he has no conception of reality at the time I interviewed him. It is my professional opinion that he is psychotic, that he is unable to help with his defense and that I feel he could very easily be homicidal. This for the most part would be directed towards white people but he has inflicted bodily harm on at least two occasions towards his own black race. In a mental hospital setting and on appropriate anti-psychotic drugs, I feel that Mr. Jolley would respond and improve as far as his psychosis is concerned. However, I believe with his limited ability for insight that once he is discharged he will stop his medication and become

---

physician specializing in psychiatry and competent to testify, were he present, and that would be his testimony."

6. Twenty years old at the time of the report, Jolley had been a social problem since the age of sixteen. "Apparently in desperation [his mother] sought advice and counsel and treatment for her son all without avail. . . . The family has been terrified of this young man and [his] mother had even reached the point of hiding the knives in the home."

psychotic and homicidal again. This is where the difficulty in how he should be handled in our society arises. When his psychotic process is under control the mental hospitals do not want him and he would be discharged to the general population only to stop taking his medication and be a detriment to society again. The only possible way this could be averted is for him to be put on a lifelong type probation where he is required to report to a mental health clinic and they be held in contempt of court if they did not report his not keeping his appointment so that he could be treated with intermuscular injections which last two weeks. If it is not handled in a form similar to this, when he does go psychotic he is quite capable of hurting someone."

Dr. Reeves gave his thoughts on why Perkins stated that Jolley was now competent to stand trial:

"I am not sure but I would imagine the reason Clifton T. Perkins stated that he was now capable of handling his own defense was that they had him on anti-psychotic drugs there. He is not on any medication in the Dorchester County Jail and is certainly now presently psychotic."

George D. Willoughby, the Chief Deputy Sheriff for Dorchester County, was called by Jolley. Willoughby had observed Jolley during Jolley's confinement in the Dorchester County Jail. Jolley would send Willoughby "a note about three or four days out of a week, usually in the morning. . . . [N]othing makes any sense that he writes, just a jumbled up bunch of words on a piece of paper." A sample of the type of letter was admitted in evidence. It read:

" 'Dear Sir: Tyrone A. Jolley, I like to sign up for two more months Clifton T. Perkins Institution.' . . . 'evaluation, Ward 4, the one I left. Sincerely yours. When me things are placed money, etc., especially 9433503. Mrs. Dorsey Dixon 2,500 to 3,500 watchband 9434208 money mother $500 pay for

cooperation today or as soon as possible, two months at or as you see reasonable.' "

Willoughby was not sure that Jolley knew "the charges pending against him," although he knew he was in jail "[b]ecause he shot a man." When Jolley was arrested he told Willoughby "he had to do it. He didn't say why he had to do it."

Emory Tamplin, Jolley's attorney, took the stand at his own behest. He testified:

> "Your Honor, concerning the competency of the defendant to stand trial at this time in this matter, I have had occasion to speak with him prior to his originally going to Clifton T. Perkins where he spent sixty days, and I have had an opportunity to speak with him upon his return; and, also, have had an opportunity to confer with family and other people who have had contact with him. And, based on my personal contact with him and my personal conversations with him as his attorney to explain the nature of the offense, what is involved for the offense, the seriousness of the matter, Mr. Jolley has exhibited to me that he did not comprehend that he is the person on trial.
>
> He has at times expressed the opinion that it is not he who is on trial, it is the person who was shot here who is on trial, and that the charges were charges brought by him against the other party. He has requested to have those charges pressed when I have tried to explain that there are no such charges."

Upon inquiry by the court, Tamplin said that there were times when he believed that Jolley knew the charges pending against him. At other times Tamplin was sure that Jolley did not feel that charges were pending against him, but that the charges were against the victim of the crimes. Tamplin could not explain how Jolley related the victim to the case.[7] It was

---

7. It appeared from the testimony of the Chief Deputy Sheriff of Dorchester County that the victim was Allen Westbrook Bradshaw, who was dove hunting about a half a mile from Jolley's home on someone else's

Tamplin's opinion that Jolley could not assist in the defense. Jolley could not inform Tamplin in a rational manner of the names of witnesses he would like to testify in his behalf. "The people he would mention at times would have no connection to this." Since Jolley had been in jail, he had made a number of unusual requests of Tamplin "of a nature that have been far out of the ordinary from what you would expect from the normal request made to an attorney in a normal client relation — attorney/client relationship."

Jolley took the stand at his own request. He said that he wanted to be questioned. His attorney said he had no questions to propound. The State attempted to question him but desisted when he seemed incoherent.

The State called Dr. Ido Adamo, a physician specializing in psychiatry at Perkins. It was stipulated that he was so qualified. He said that on 5 November 1976 the medical staff of Perkins became aware that Jolley had a mental disorder, the diagnosis being schizophrenia, paranoid type, but "for the purpose of competency he seemed to be aware of the charges and he seemed to possess the capacity to assist in the defense." Dr. Adamo was asked to explain the apparent incongruity between Jolley's competency to stand trial and his mental disorder. He said:

> "When we say competent to stand trial, we don't consider at all the extent of the mental disorder. We consider whether they understand the nature and the object of the proceedings against them and whether they have a capacity to assist in the defense. People can be psychotic and be competent to stand trial."     ....

Upon inquiry by the court, the witness stated that a person could be competent to stand trial and at the same time meet the legal definition of insanity "because the criteria for insanity is to lose capacity to appreciate the conduct and to conform and or to conform with that conduct to requirements

---

property. Jolley approached, carrying a large dinner fork. They started to talk about dove hunting. Jolley attempted to stab Bradshaw with the fork, then took Bradshaw's gun and shot him.

of the law. So that is a different criteria for competency."
Also a person could be insane at the time of the commission
of a crime and sane at the time of trial. On cross-examination
Dr. Adamo indicated that Jolley's condition had not changed
during the period from 5 February 1976, when Dr. Reeves
saw him, to 5 November 1976 when the Perkins staff had its
conference. "[L]et's not forget that we never said he was not
competent. We really — we always felt he was competent
from the very day he came to Perkins. Perkins asked for more
time because "[w]e wanted to be better documented as to the
analysis and competency. We did not administer any
medication whatever, none, injectable or by mouth." The
difference between the opinions of Dr. Reeves and Dr. Adamo
was that, although both agreed that Jolley was psychotic,
suffering from schizophrenia, paranoid type, Reeves believed
that Jolley was unable to understand the nature of the object
of the proceeding against him and to assist in his defense and
Adamo believed that Jolley was able to do so. Thus, the trial
court was confronted with the conflicting opinions of two
qualified expert witnesses. Although the two witnesses were
in complete agreement, not only that Jolley suffered from a
mental disorder but as to the nature of that disorder, they
were diametrically opposed as to his competency to stand
trial. There was no indication that either of them based his
opinion on this issue upon any criteria not considered by the
other. It was simply, as Adamo put it, "[Reeves] says [Jolley]
is psychotic and therefore not competent; and, I say that he
can be psychotic and still be competent."

It was the duty of the trial court to "determine upon
testimony and evidence presented on the record" whether
Jolley was competent to stand trial in the contemplation of
Art. 59, § 23. A determination that an accused is competent
to stand trial must be found beyond a reasonable doubt.
*Raithel,* 280 Md. at 297; *Hill v. State,* 35 Md. App. 98, 101-104,
369 A. 2d 98 (1977); *Colbert v. State,* 18 Md. App. 632, 641,
308 A. 2d 726, *cert. denied,* 269 Md. 756 (1973); *Rozzell v.
State,* 5 Md. App. 167, 175, 245 A. 2d 917 (1968), *cert. denied,*
252 Md. 732 (1969); *Strawderman v. State,* 4 Md. App. 689,
697, 244 A. 2d 888 (1968), *cert. denied,* 252 Md. 733 (1969). It

appeared to the judge that "under the evidence I am compelled to reach a finding that it has not been shown beyond a reasonable doubt that the accused understands the nature and object of the charges against him and is able to assist in his defense." Jolley was to be committed to Perkins "until such time as the court is satisfied the defendant is competent to stand trial." The judge indicated that Perkins should also evaluate Jolley as to his criminal responsibility at the time of the commission of the offenses. On 2 May 1977 the court issued two orders committing Jolley to Perkins, by the first until such time as the court was satisfied that he was "competent to stand trial or has ceased to be, by reason of mental disorder, a danger to himself or to the safety of the person or property of others," and by the second "until it has been determined whether [he] was legally insane at the time of the commission of the alleged crime." These orders were not challenged.

Under date of 11 August 1977, Perkins submitted a report to the court in compliance with the orders of 2 May. Referring to Jolley's admission on 26 May 1977 after having been found not competent to stand trial, it noted that Jolley had "received a comprehensive psychiatric evaluation and other pertinent studies." The report set out the results of the evaluation:

> "Mr. Jolley was presented before a Medical Staff Conference on August 8, 1977 at which time he was interviewed and his case reviewed. Mr. Jolley appeared during that conference in a very unemotional manner and was able to describe the incidents which led to his arrest. During the interview, he still displayed the presence of a psychiatric disorder, but did appear to be enough in contact that he was able to understand what he had been charged with and to have the ability to assist counsel in his own defense.
>
> It was the unanimous opinion of the Medical Staff that the diagnosis is Schizophrenia, Paranoid Type. Based upon our present evaluation, it was the unanimous opinion of the Medical Staff that at the

present time, Mr. Jolley is able to understand the nature and object of the proceedings against him and to assist in his own defense. It was the further unanimous opinion of the Medical Staff that at the time of the alleged offense the patient was suffering from a mental disorder which caused him to lack substantial capacity to appreciate the criminality of his conduct."

The report concluded with a "request that trial be set in this case as soon as possible and that Mr. Jolley be permitted to remain in our hospital until trial."

On 1 September 1977 the court held a second hearing on the issue of Jolley's competency to stand trial. The State called Dr. Adamo and the defense stipulated as to the expertise of the witness in "the medical field of psychiatry." Dr. Adamo summarized the findings of the staff conference of 8 August:

"The opinion of the staff was that he, unanimous opinion, was that despite the presence of a serious mental disorder, he was, nevertheless, competent to stand trial. He appeared to be able to understand the proceedings against him and he had the capacity to assist counsel in the defense."

He said that Jolley was "even now" suffering from a "serious mental illness or disorder," namely, "schizophrenia, paranoid type." He was asked whether Jolley's mental health had improved since April. He replied: "Not very much. We are not saying that he has improved. We are saying that he is just competent to stand trial." Jolley's mental health was "more or less the same" at the time of the hearing as it was the preceding April. "He suffers from a serious mental disorder." Adamo iterated his position: "Essentially, my opinion is that he is competent to stand trial. He was not responsible at the time of the offense, and he requires inpatient care because of the dangerousness." That was Dr. Adamo's opinion in April and it was his opinion at the time of the second hearing. Upon inquiry by the court Dr. Adamo said that he agreed with the opinion of Dr. Reeves as expressed in the report of 7 February

1977, that as long as Jolley was on drugs he would respond to treatment, but once he is discharged and stops his medication he would become psychotic and homicidal. This colloquy took place between the witness and the court:

"THE COURT: Let this man loose and he stops his drugs, somebody is going to get hurt.

THE WITNESS: We have no plans to let him loose until — first of all, in order to let him loose, you should approve that. I mean, we can't just discharge anyone without the Court's approval. Thus, we never discharge a patient who has been found not guilty by reason of insanity without a five year discharge plan.

THE COURT: The law states that any time after three months from the date of confinement he shall have a right to apply for his release, right?

THE WITNESS: That's correct.

THE COURT: Judicial hearing.

THE WITNESS: Yes.

THE COURT: If we have such a hearing and all the testimony that is presented to the court is that he should be released, it's going to be reversible error for the court not to release him. So the Court's hands are tied.

THE WITNESS: It's very unlikely you will find a psychiatrist —

THE COURT: Not unlikely when I've got this letter in front of me that this man is going out and kill a whole lot of people that I'm going to let him loose, because I've been here long enough to know that when anything happens it is always the judge that does it, and it was the judge that let him loose and he turns around and kills a whole lot of people." Dr. Reeves' letter states he is a dangerous man.

THE WITNESS: That is correct.

THE COURT: You say his condition is the same as it was then.

THE WITNESS: I agree with Dr. Reeves. I have no qualms with Dr. Reeves. I agree entirely. The issue is very narrow as far as I can see. We feel that he is competent to stand trial."

On cross-examination Dr. Adamo was asked: "Since April of 1977 until the August date of 1977 medical staff conference, have you seen any change whatsoever, any improvement of any type in the ability of Mr. Jolley to understand the nature of the proceedings that are being held here today? "[8] He replied: "This man is psychotic. . . . He suffers from a very serious mental disorder. There is no question about that. I feel he's still competent because he seems to realize what he is being charged with and what the proceedings are against him and whatever the ability to assist counsel. I mean, that's as far as we get." It was adduced that Dr. Adamo, as part of his consultation with Jolley, had discussed the pending criminal charges with him "a long time ago." Although Dr. Adamo's memory was "not too fresh" with respect to the details of the discussion, Jolley "seemed very delusional at times as to the events. . . . He claimed he didn't remember the events or preferred not to talk." Defense counsel pursued the point:

"Q. As I said, I don't want to go into the particulars of that discussion with you, but I just want to know did you have opportunity to discuss the matter with him?

A. Yes, some time ago, yes.

Q. You did talk to him about it. Okay.

Now, the letter of August 11, 1977 makes reference that Mr. Jolley was able to describe the incident which led to his arrest.

A. In the course of the staff conference.

Q. He was able to describe the incident.

A. It seems so.

8. Dr. Adamo was not present at the medical staff conference of 8 August 1977 but said he would have agreed with the conclusions reached by the three psychiatrists participating in the conference.

Q. Was he able to respond to questions concerning the incident?

A. See, since I was not present at that conference I'm not able to answer.

Q. At your discussion?

A. He had psychological testing done.

Q. At any discussion of the incident that you have had with him was he able to respond to questions about the incident?

A. The chart where I made notes has been in possession of the Court, and so all the material in regard to that work is there.

Q. Yes, sir.

A. In that file.[9]

Q. Have you had an opportunity to talk with Mr. Jolley about the proceedings that were going to take place here today?

A. It's my understanding that he knew he was going for trial on those charges.

Q. Do you have any knowledge as to what his understanding or his ability to understand the nature of the proceedings here today is?

A. My opinion is that he does have a general idea what is going on, but he may not be aware of all the details or the technicalities. But I think he seems to be aware of what is happening.

Q. Is that awareness, in your opinion, sufficient to meet the medical definition of competency to understand the nature of the proceedings?

A. In my opinion it is sufficient."

That, he made clear, was also his opinion at the April hearing. Dr. Reeves' report of 7 February 1977 was admitted in evidence by stipulation. Upon inquiry by the court, defense counsel expressly asserted that the defense would not offer

_____

9. The chart, notes and file referred to by Dr. Adamo are not made part of the record extract or appendix submitted to us.

any evidence. The hearing continued with argument of counsel.

It was the State's position that "under the state of this record there is no way possible that this man can be found competent to stand trial." Its point was that Jolley had been judicially determined to be incompetent in April and that the only medical opinion was that his mental health was the same as it was then. "The state of the record is that he is in the same health he was when this court judicially determined him to be incompetent. Dr. Adamo's testimony proved beyond any doubt that the man is incompetent. . . . He said that the defendant's accounts of the crime are delusional, that he preferred not to talk about events." The State reiterated that "because of the judicial determination in April and medical testimony that his health has not improved," the testimony and evidence presented on the record were not legally sufficient for the court to find beyond a reasonable doubt that Jolley was competent to stand trial.

Defense counsel agreed that as Jolley had properly raised the issue of his competency to stand trial, the burden was on the State to establish beyond a reasonable doubt that he was competent. But he completely reversed the view he had successfully importuned the court to adopt at the first hearing. He frankly admitted that at the first hearing he believed that on the evidence Jolley was not competent to stand trial, even though that view did not coincide with the medical staff opinion of Perkins. He referred to his own testimony given at the first hearing "relative to [Jolley's] ability to comprehend and assist his counsel in the preparation of his case and to understand the nature of the proceedings at the time, and at the time I fully felt that the man was — no question he was not competent to stand trial." Although he had no reluctance at the first hearing in expressing an opinion as to Jolley's ability to assist in his defense based on his observations of and discussions with his client, he now thought he was unable to take a position:

> "I would further state for the record that I have
> had an opportunity to speak with Mr. Jolley this

morning concerning the nature of this proceeding here today, and I don't feel that at this point I can make a statement one way or the other as to his competency to stand trial. I don't feel I am medically qualified."

Defense counsel thought that the opinion of the medical staff of Perkins should prevail.

It was in light of all of this that the following colloquy took place:

"THE COURT: They state in their report, in their letter of August the 11th, Perkins states, that it was the unanimous opinion of the medical staff that he was insane at the time of the crime.

MR. TAMPLIN [defense counsel]: Yes, sir.

THE COURT: So it is obvious the direction you're trying to get. Ordinarily, you would take the position just opposite. You would argue that he's not competent to stand trial. Now you want him to be competent because you think he will be declared not guilty by reason of insanity. Then he comes under the 90 day rule where he can apply for his release. Then we are back to the Hopkins case in Baltimore that brought on such a hue and cry, and rightfully so. The man, possibly, will be walking the streets. The report from Dr. Reeves says he just might up and start shooting people, particularly people of one particular color.

MR. TAMPLIN: Yes, sir.

THE COURT: So then what happens? Some dumb judge lets him loose so he can prey upon society and kill everybody in sight.

MR. TAMPLIN: Your Honor, I can comment only that the attorneys as well as the courts are bound by the rules that we are given to work with.

THE COURT: I know we are bound, and we may well get reversed. That will be up to the appellate court."

The judge was obviously concerned, and fairly so, with the ultimate disposition of Jolley. He clearly, however, expressed his awareness of his obligation to determine, beyond a reasonable doubt, upon testimony and evidence of medically trained psychiatrists presented on the record, whether Jolley was able to understand the nature of the object of the proceeding against him and to assist in his defense. It is manifest that he recognized that the test for competency to stand trial and the test for criminal responsibility at the time of the commission of the offense were separate and distinct. *Strawderman,* 4 Md. App. at 697.

As at the first hearing, the expert witnesses were in complete agreement that Jolley was afflicted with a serious mental disorder, schizophrenia, paranoid type, by reason of which he was a danger to himself or to the safety of the person or property of others. The experts were also of a mind that Jolley's mental condition had not significantly improved since April 1977.[10] But, as at the first hearing, they disagreed, although considering the same criteria, on whether Jolley was competent to stand trial. The trial judge recognized this:

> "Now, we still have Dr. Reeves, although he isn't here, but it was agreed that his report was admissible. We have the further testimony that the situation as far as the defendant is concerned hasn't changed since April of 1977. If we take the findings of the court at that time and again consider the testimony and report of Dr. Reeves and no additional evidence being offered today, except Mr. Tamplin saying the man talks a little better about understanding the matter with which he is charged, how can the court determine beyond a reasonable doubt that the accused is able to understand the

---

10. Dr. Adamo indicated during his testimony at the second hearing that when Jolley was returned to Perkins after the first hearing, the primary concern was whether he was insane at the time of the commission of the offenses. At one point in his testimony he said:

"If I may interject something, the order was received, indicated it was in April, written in May, signed 3rd of May [sic], that he was returned to Perkins for treatment and evaluation until it has been determined whether the defendant was legally insane at the time of the commission of the alleged crime. Really, that's what we did."

nature and object of the proceeding against him and to assist in his defense?

The Court doesn't think it can. The Court finds that Tyrone Anthony Jolley is incompetent to stand trial."

Faced with two conflicting expert opinions on the issue of competency to stand trial, the judge was persuaded by that of Dr. Reeves. *See A. H. Smith Sand & Gravel v. Dept.,* 270 Md. 652, 667, 313 A. 2d 820 (1974); *Surkovich v. Doub,* 258 Md. 263, 272, 265 A. 2d 447 (1970); *Continental v. Kouwenhoven,* 242 Md. 115, 127, 218 A. 2d 11 (1966); *State Roads v. Creswell,* 235 Md. 220, 227, 201 A. 2d 328 (1964); *Duvall v. Potomac Electric,* 234 Md. 42, 47, 197 A. 2d 893 (1964). His determinations are reflected in his order of 1 September 1977 from which this appeal was taken:

"At a hearing held on Thursday, September 1, 1977, to make a preliminary determination of the question of whether Defendant lacked the 'capacity to understand the proceedings and to adequately participate in a trial of the case', the Court determined that the Defendant is unable to understand the nature of the object of the proceeding against him and to assist in his defense, and that the Court could not find beyond a reasonable doubt that he was able to understand the nature of the object of the proceeding against him or to assist in his defense.

The Court further found that, by reason of mental disorder, the Defendant would be, if he became a free agent, a danger to himself and to the safety of the property or person of others.

Accordingly, it is this 1st day of September 1977, by the Circuit Court for Dorchester County, ORDERED that Tyrone Anthony Jolley be committed to the Clifton T. Perkins Hospital Center until such time as the Court is satisfied that the Defendant is competent to stand trial or has ceased to be, by reason of mental disorder, a danger to

himself or to the safety of the person or property of others."

*See* Maryland Code (1957, 1972 Repl. Vol.) Art. 59, §§ 23-24. We cannot say that his judgment on the evidence was clearly erroneous. Maryland Rule 886.

In so concluding, we need not decide whether the judge's remarks concerning defense counsel's change of position with respect to the competency of Jolley to stand trial reflected a consideration in his decision. Both the State and defense counsel conceded in oral argument before us that Jolley's competency to stand trial should be based upon a current evaluation and a fresh hearing on that issue. We agree that this should be done.

*Order of 1 September 1977 affirmed; costs to be paid by appellant.*