SIGMA REPRODUCTIVE HEALTH CENTER *v.* STATE
OF MARYLAND ET AL.

[No. 18 (Adv.), September Term, 1983.]

*Decided 'November 22, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Alison D. Kohler,* with whom were *G. Stewart Webb, Jr., Venable, Baetjer & Howard, Arthur B. Spitzer* and *Elizabeth Symonds* on the brief, for appellant.

*Daniel J. Hurson,* with whom were *Hundley & Cacheris, P.C.* on the brief for appellee Debra Braun. No brief filed on behalf of appellee State of Maryland.

SMITH, J., delivered the opinion of the Court.

We shall be obliged to dismiss this appeal because it is not from a final judgment. However, we shall give reasons for our view that the defense of necessity is not available to a trespasser at an abortion clinic.

I

Appellant Sigma Reproductive Health Center is an unincorporated subsidiary of SIGMA Centers of America, Inc. The former operates a family planning and reproductive health clinic in Montgomery County. It offers a variety of health care services, including first trimester abortions. Physicians licensed by the State of Maryland perform these abortions in accordance with Maryland law.

Appellee Debra Braun participated in a demonstration against abortion held at Connecticut Belair Medical Park where Sigma leases office space. She and other trespassers were requested to leave Sigma's reception area. She refused. As a result she was arrested and charged with two counts of trespass. On September 7, 1982, she was tried and convicted of trespass in the District Court of Maryland. She appealed that conviction to the Circuit Court for Montgomery County. That trial has not yet been held.

On December 2, 1982, Braun served a subpoena duces tecum on Sigma in which she sought production, prior to trial, of: "records of all abortion patients processed at the Sigma Reproductive Health Center insofar as these pertain to the performance of abortions, and patient follow-up and patient outcomes for the three-month period up through and

including August 7, 1982" with the provision that patients' names might be deleted from the files; "a list of all patients who have sued the clinic or any doctor who performed any abortions upon them therein, or both, together with any other party or parties, for medical malpractice, or whose estates or survivors have so sued such clinic, doctor, or other party or parties"; "copies of all releases required by such clinic to be signed by any patient seeking an abortion with the patients' names deleted therefrom"; and "copies of all documents or other materials used to explain the risks present inevitably in the performance of any abortion to the clients of such clinic together with a written explanation (if any is now in existence) of how such risk explanatory documents are used and when they are so used." Braun advised the court that, in connection with her motion for the subpoena, she would "raise the legal doctrine of necessity as a complete defense to her actions in committing the alleged act of trespassing." She submitted a detailed memorandum to that effect. Both the State and Sigma moved to quash the subpoena, arguing, among other things, that "[a]s a matter of law, Defendant cannot assert the defense of necessity on the facts of this case."

At the hearing on the motion to quash, Braun argued that her trespass was justified because she wished both "to save the life of unborn fetuses" and "to protect the health and well-being of the women who were going into the Clinic that day for abortions." She further argued that she,

> "need[ed] these records . . . to prove the objective fact, or corroborate the objective fact that there was negligence, that there had been inadequate counseling, that there had been sloppy preparation, that there had been other injuries that may not have resulted in law suits that would be on the public record."

In denying the motion to quash the circuit court judge declined to address the issue of necessity. She ordered that the subpoena duces tecum be issued but she modified the

time period relevant to the documents to be produced, limiting it to the two-week period prior to the arrest. No similar time limitation was placed on the other items requested. Sigma promptly appealed to the Court of Special Appeals. The proceedings have been stayed pending appeal. On our own motion we issued a writ of certiorari prior to argument in the Court of Special Appeals in order that we might address the important public question here presented.

## II

We first consider whether there is a right of appeal in this case.

As in the federal system, with certain limited exceptions not applicable to this case, appeals from circuit courts in this State are limited by Maryland Code (1974) § 12-301, Courts and Judicial Proceedings Article, to those from final judgments. In *Stewart v. State,* 282 Md. 557, 571, 386 A.2d 1206 (1978), we said there was no substantive difference between 28 U.S.C. § 1291 and the Maryland statute. Further we have stated that it is elementary that parties may not confer appellate jurisdiction by consent upon this Court or the Court of Special Appeals. *East v. Gilchrist,* 293 Md. 453, 458, 445 A.2d 343 (1982); *Pappas v. Pappas,* 287 Md. 455, 466, 413 A.2d 549 (1980); *Price v. Hobbs,* 47 Md. 359, 378-79 (1877).

The right to appeal is statutory, based upon the law we have previously cited, rather than constitutional. *See Peat & Co. v. Los Angeles Rams,* 284 Md. 86, 90, 394 A.2d 801 (1978); *Neal v. State,* 272 Md. 323, 324, 322 A.2d 887 (1974); *State v. Haas,* 188 Md. 63, 67, 51 A.2d 647 (1947). Although the General Assembly has stated that appeals may be heard only from final judgments, it is for the courts to define and give content to the meaning of the term "final judgment." *Peat & Co.,* 284 Md. at 90-91; *Warren v. State,* 281 Md. 179, 182-83, 377 A.2d 1169 (1977).

The rule that an appeal will lie only from a final judgment and not from an interlocutory judgment is firmly established

in our legal system. The primary rationale is to prevent piecemeal appeals and to prevent the interruption of ongoing judicial proceedings. *See United States v. Nixon,* 418 U.S. 683, 690, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974); *Peat & Co.,* 284 Md. at 91; *Warren,* 281 Md. at 183; *Neal,* 272 Md. at 324-25 (quoting *Lee v. State);* and *Lee v. State,* 161 Md. 430, 432, 157 A. 723 (1931). Thus, the rule is designed to promote judicial efficiency and economy. Although the rule appears to be simple enough, as this Court has noted the determination of whether a judgment is final is not always easy. *See, e.g., Peat & Co.,* 284 Md. at 91; *United States Fire Ins. Co. v. Schwartz,* 280 Md. 518, 521, 374 A.2d 896 (1977) (dicta). Because of the difficulty in determining whether an issue before an appellate court arises from a final judgment, this Court has formulated a definition: "[T]he judgment must be so final as to determine and conclude rights involved, or deny the appellant means of further prosecuting or defending his rights and interests in the subject matter of the proceeding. *In re Buckler Trusts,* 144 Md. 424, 427, 125 A. 177 (1924)." *Schwartz,* 280 Md. at 521 (dicta). *See also In re Special Investigation No. 231,* 295 Md. 366, 370, 455 A.2d 442 (1983); *Peat & Co.,* 284 Md. at 91 (quoting *Schwartz);* *Warren,* 281 Md. at 183 ("[T]o be final a judgment must actually settle the rights of the parties . . . or it must finally settle some disputed right or interest of the parties . . . ."). Notwithstanding the development of the collateral order doctrine in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949) and its progeny, see *infra,* the federal courts and this Court, with relatively few exceptions, have strictly adhered to the final judgment rule.

As we have noted previously, a final judgment exists when the rights of litigants have been established conclusively at the trial level. The general rule in criminal cases is that no final judgment exists until after conviction and sentence has been determined, or, in other words, when only the execution of the judgment remains. *See, e.g., Parr v. United States,* 351 U.S. 513, 518, 76 S. Ct. 912, 100 L. Ed. 1377

(1956); *State v. Powell,* 186 Conn. 547, 442 A.2d 939, 943, *cert. denied,* 103 S. Ct. 85 (1982); *Warren,* 281 Md. at 185-86; *Pearlman v. State,* 226 Md. 67, 70, 172 A.2d 395 (1961); *Lee,* 161 Md. at 432. Ordinarily, therefore, an appeal from a pretrial or trial order will not be heard where there are pending proceedings in which issues on the merits of the case remain to be decided. Such orders are interlocutory, not final, and nonappealable until after entry of a final judgment. *See, e.g., Grinnell Corp. v. Hackett,* 519 F.2d 595 (1st Cir.), *cert. denied,* 423 U.S. 1033 (1975); *United States v. Moore,* 368 F. 2d 990 (9th Cir. 1966); *Alexander v. State,* 260 Ark. 785, 545 S.W.2d 606 (1976); *People v. Ealy,* 49 Ill. App. 3d 922, 365 N.E.2d 149 (1977); *Warren,* 281 Md. 179; *Commonwealth v. Washington,* 428 Pa. 131, 236 A.2d 772 (1968).

Despite this prevailing policy, courts have carved out some exceptions. Most of these exceptions in criminal cases concern the constitutional or other rights of criminal defendants and thus are not directly applicable here. The rationale of the courts in permitting appeals from certain pretrial or trial orders is that the rights of the defendant would be lost or irreparably harmed if an appeal was not allowed until after trial. Thus, the pretrial or trial order's determination of the defendant's rights is considered to be separate from the merits of the case and immediately appealable. As the Supreme Court of Iowa stated:

> "If an order decides an issue merely as a step toward final disposition of a prosecution, it is interlocutory; however, if it disposes of a separable branch of the case, it is an appealable final judgment." *State v. Lekin,* 271 N.W. 2d 697, 700 (Iowa 1978).

Those orders which courts have held that the defendant can immediately appeal include those involving: his right not to be subjected to double jeopardy, see *Abney v. United States,* 431 U.S. 651, 97 S. Ct. 2034, 52 L. Ed. 2d 651 (1977); *Powers v. United States,* 412 A.2d 1205 (D.C. 1980); *Neal,* 272 Md. at 326; *State v. Thomas,* 61 Ohio St. 2d 254, 400

N.E. 2d 897, *cert. denied,* 449 U.S. 852 (1980); his right to file an in forma pauperis petition or to allege his right to bring a case as an indigent, see *Roberts v. United States District Court,* 339 U.S. 844, 70 S. Ct. 954, 94 L. Ed. 1326 (1950); *Pearlman,* 226 Md. 67; and his right to be adjudged competent to stand trial, see *Jolley v. State,* 282 Md. 353, 384 A.2d 91 (1978). Trial court orders that have been determined to be interlocutory and nonappealable include those involving the denial of: defendant's motion to dismiss the indictment because his right to a speedy trial had been violated, see *United States v. MacDonald,* 435 U.S. 850, 98 S. Ct. 1547, 56 L. Ed. 2d 18 (1978); *Stewart,* 282 Md. 557; defendant's motion concerning pretrial discovery orders, see *Dow Chemical Co. v. Taylor,* 519 F. 2d 352 (6th Cir.), *cert. denied,* 423 U.S. 1033 (1975); *Kardy v. Shook,* 237 Md. 524, 207 A.2d 83 (1965); defendant's motion to suppress evidence, see *State v. Cooley,* 430 A.2d 789 (Del. 1981); defendant's motion for a new trial because of the trial court's selection of venue after defendant's exercise of his right to removal, see *Lee,* 161 Md. 430; and defendant's motion for new trial, see *State v. Asherman,* 180 Conn. 141, 429 A.2d 810 (1980). *Accord Warren,* 281 Md. 179 (appeal from an order for probation without judgment); *State v. Powell,* 186 Conn. 547 (appeal from a motion to disqualify the prosecutor because of a personal interest in the outcome of the litigation).

In its motion to advance this case for oral argument in the Court of Special Appeals, Sigma relied upon *Cohen,* 337 U.S. 541, among other cases, which laid down the collateral order doctrine that numerous litigants have relied upon — most often unsuccessfully — because it constitutes an exception to the final judgment rule. *Cohen* involved a shareholder derivative suit which was in federal court because of diversity of citizenship. The trial court denied the corporate defendant's motion to compel plaintiff to give security for costs pursuant to an applicable state statute. The corporation appealed. In holding that the order was appealable, the Court noted that 28 U.S.C. § 1291 generally does not "permit appeals even from fully consummated decisions,

where they are but steps towards final judgment in which they will merge. The purpose is to combine in one review all stages of the proceeding that effectively may be reviewed and corrected if and when final judgment results." 337 U.S. at 546. In *Cohen* the district court order neither involved a step toward final disposition of the merits nor did it represent an aspect of the case that would be merged in a final judgment. *Id.* The Court concluded:

> "This decision appears to fall in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. . . .
>
> "We hold this order appealable because it is a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it. But we do not mean that every order fixing security is subject to appeal. Here it is the right to security that presents a serious and unsettled question. If the right were admitted or clear and the order involved only an exercise of discretion as to the amount of security, a matter the statute makes subject to reconsideration from time to time, appealability would present a different question." 337 U.S. at 546-47.

Since the *Cohen* decision the Supreme Court has refined the collateral order doctrine, but has applied it only to a relatively few issues of law. For example, in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978), the Court stated that to come within the collateral order doctrine, "the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment."

437 U.S. at 468 (footnote omitted). In that case the Court held that the collateral order doctrine did not apply to a trial court's determination that the suit could not be maintained as a class action: the determination of whether a class existed was not only closely intertwined with the facts and legal issues of the case, but also was subject to effective review after final judgment.

As noted in *MacDonald,* 435 U.S. at 854, the Court has applied the collateral order doctrine in only two criminal cases. First, in *Stack v. Boyle,* 342 U.S. 1, 72 S. Ct. 1, 96 L. Ed. 3 (1951), the Court held that an order denying a motion to reduce bail is appealable as a final decision: the order conclusively determined the bail issue; the order involved an important issue that was separable from the merits of the case; and "unless it can be reviewed before sentence, it never can be reviewed at all." 342 U.S. at 12 (Jackson, J., concurring). Second, in *Abney,* 431 U.S. 651, the Court held that a pretrial order denying a motion to dismiss an indictment on double jeopardy grounds fell within the *Cohen* collateral order doctrine: the order was a complete and final rejection of the defendant's double jeopardy claim; the nature of the double jeopardy allegation was separable from the central issue of guilt or innocence; and the rights of the defendant would be undermined severely if he were required to defer appeal until the trial was terminated. 431 U.S. at 659-62.

In *MacDonald* the Court refused to apply the collateral order doctrine to the denial of a motion to dismiss because of an alleged violation of the Sixth Amendment right to a speedy trial: such an order lacked finality because it was not a complete and final rejection of the defendant's claim; there was no separation of the prejudice to the defendant in conducting his defense due to delay and the central issue of guilt or innocence at trial; and no important right to review would be lost on appeal after trial because the right to a speedy trial goes to delay before the trial and not the trial itself. 435 U.S. at 857-61.

The three prongs of the *Cohen* collateral order doctrine, in the context of a criminal proceeding, were clearly enunci-

ated in *United States v. Yellow Freight System, Inc.,* 637 F.2d 1248 (9th Cir. 1980), *cert. denied,* 454 U.S. 815 (1981):

> "As applied to criminal pretrial orders, [the *Cohen*] rationale confers appellate jurisdiction when:
>
> 1. The pretrial order fully disposed of the appellants' claim;
> 2. The appellants' claim is collateral to, and separable from, the principal issue of guilt or innocence; and
> 3. The order involves an important right that would be lost if review had to await final judgment."

637 F.2d at 1250-51.

*Accord United States v. Rey,* 641 F.2d 222 (5th Cir.), *cert. denied,* 454 U.S. 861 (1981); *United States v. Harrod,* 428 A.2d 30 (D.C. 1981) (en banc); *Jolley,* 282 Md. at 357. As another federal court has stated, the three elements of the collateral order doctrine are separability, importance, and urgency. *See Grinnell v. Hackett,* 519 F.2d at 596.

Although state and federal courts have taken steps to clarify the three elements of the collateral order doctrine, they have been reluctant to apply the *Cohen* rationale in a broad fashion. Indeed, courts have applied the collateral order doctrine only sparingly to both civil and criminal proceedings. One of the areas in which courts have demonstrated a high degree of unwillingness to apply the collateral order doctrine, or for that matter to allow an appeal on another basis, is to petitions filed by third parties who seek reversal of trial or pretrial orders in criminal proceedings.

To fit within the collateral order doctrine, an appellant must convince the Court that a case satisfies all three elements of the *Cohen* test. In applying that doctrine to the facts in the case at bar it would appear that the denial of the motion to quash is not appealable. First, the order to produce documents pursuant to the subpoena duces tecum is not com-

pletely separable from the merits of the criminal proceedings. As noted in *Nixon,* 418 U.S. 683, "Enforcement of a pretrial subpoena *duces tecum* must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues." 418 U.S. at 702. Second, the order to produce does not finally and conclusively determine Sigma's claim. Rather, if Sigma had failed to comply with the order and had been cited for contempt, then there would have been a final order. *See infra.* The denial of a motion to quash itself was not a final disposition. Third, although the order involved an important right — the privacy rights of Sigma and its patients — the right would not have been lost on appeal if Sigma had been cited for contempt.

Distinct from these cases that have applied the collateral order doctrine are several cases that have confronted the issue of whether a person who is not a party to a criminal proceeding may appeal from the denial of a motion to quash a subpoena duces tecum. Although the facts and circumstances are distinguishable, the rationale underlying these cases would seem applicable here. In general, the courts have held that in order to appeal the denial of a motion to quash a subpoena duces tecum, the third party must be cited for contempt. In other words, only an appeal from a contempt order, as opposed to an order to produce documents pursuant to the subpoena, is final enough and separable enough from the merits to confer the power of review on an appellate court.

The Supreme Court dealt with this issue in *Alexander v. United States,* 201 U.S. 117, 26 S. Ct. 356, 50 L. Ed. 686 (1906). There the Government sued several corporations under the Sherman Antitrust Act. A special examiner had been appointed to hear and take testimony. He served a subpoena duces tecum on the appellants as officers of various companies and as individuals. They appeared at the hearing but did not produce the requested documents. The trial court ordered production. The officers appealed. The Court, in holding that the order was not appealable, stated:

"In a certain sense finality can be asserted of the orders under review, so, in a certain sense, finality can be asserted of any order of a court. And such an order may coerce a witness, leaving to him no alternative but to obey or be punished. It may have the effect and the same characteristic of finality as the orders under review, but from such a ruling it will not be contended there is an appeal. Let the court go further and punish the witness for contempt of its order, then arrives a right of review, and this is adequate for his protection without unduly impeding the progress of the case. . . . This power to punish being exercised the matter becomes personal to the witness and a judgment as to him. Prior to that the proceedings are interlocutory in the original suit." 201 U.S. at 121-22.

The Court considered the issue again in *Perlman v. United States,* 247 U.S. 7, 38 S. Ct. 417, 62 L. Ed. 950 (1918). This is one of only two cases in which the Supreme Court has determined that a person need not be cited for contempt to appeal an order to produce documents. In *Perlman,* appellant had turned documents over to the court for an investigation involving a potential patent infringement. These documents proved to be material to a subsequent grand jury proceeding and the district court ordered the clerk of the court to release the materials to the United States Attorney. Perlman appealed the order. The Supreme Court found the matter appealable because "Perlman was powerless to avert the mischief of the order" and was unable to "seek a remedy at some other time and in some other way." 247 U.S. at 13. Thus, the Court created an exception to the rule that a third party must be cited for contempt where the documents subject to the subpoena duces tecum were being held in custody by someone other than the owner; in *Perlman,* the clerk of the court could not have been expected to subject himself to a contempt order on Perlman's behalf.

The other case in which the Supreme Court held that the witness need not subject himself to a contempt citation

before bringing an appeal from an order to produce documents pursuant to a subpoena duces tecum is *Nixon,* 418 U.S. 683. The Court in *Nixon* allowed the appeal because of "the unique posture of the case": it clearly had no desire to require that the President subject himself to contempt, thus necessitating a determination of the question as to whether the trial court had the power to issue a contempt order against the President. 418 U.S. at 691-92.

On the issue of whether a pretrial order pursuant to a subpoena is appealable, Judge Friendly said for the court in *Kaufman v. Edelstein,* 539 F. 2d 811 (2d Cir. 1976):

"One would have supposed it to be beyond argument that, despite *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546-47, 69 S. Ct. 1221, 1225-1226, 93 L. Ed. 1528, 1536-1537 (1949), 'An order compelling testimony . . . in an ordinary civil or criminal action is neither a final order [under § 1291] nor an interlocutory order granting an injunction [under § 1292(a)(1)] and it is not appealable. This is the oft-cited rule of *Alexander v. United States* [201 U.S. 117, 26 S. Ct. 356, 50 L. Ed. 686 (1906)].' 9 Moore, Federal Practice ¶ 110.13[2] at 153-54 (Ward ed. 1975). The remedy of the party witness wishing to appeal is to refuse to answer and subject himself to criminal contempt; that of the non-party witness is to refuse to answer and subject himself to civil or criminal contempt. *Id.* at ¶ 110.13 [4] at 165-66. We have applied this rule in many cases of non-party witnesses, in one of which, *United States v. Fried,* 386 F.2d 691, 694 (2 Cir. 1967), we specifically rejected a contrary view expressed in *Covey Oil Co. v. Continental Oil Co.,* 340 F.2d 993, 996-97 (10 Cir.), *cert. denied,* 380 U.S. 964, 85 S. Ct. 1110, 14 L. Ed. 2d 155 (1965) — as four other circuits have done, *Ryan v. CIR,* 517 F.2d 13, 18-20 (7 Cir.), *cert. denied,* 423 U.S. 892, 96 S. Ct. 190, 46 L. Ed. 2d 124 (1975); *Gialde v. Time, Inc.,* 480 F.2d 1295, 1300-01 (8 Cir. 1973); *United*

*States v. Anderson,* 150 U.S. App. D.C. 336, 464 F.2d 1390 (D.C. Cir. 1972); *Borden Co. v. Sylk,* 410 F. 2d 843, 846 (3 Cir. 1969). The doctrine has since been reaffirmed by a unanimous Court in *United States v. Ryan,* 402 U.S. 530, 91 S. Ct. 1580, 29 L. Ed. 2d 85 (1971), and was again recognized in *United States v. Nixon,* 418 U.S. 683, 690-92, 94 S. Ct. 3090, 3098-99, 41 L. Ed. 2d 1039, 1053-54 (1974), although the Court, for reasons stated in its opinion which are wholly inapplicable here, made an exception where the subpoena was directed to the President of the United States." 539 F.2d at 813-14 (bracketed material in the original).

Judge Friendly went on in footnote 3 to explain the reasons for the rule:

"3. Although it is hardly necessary to adduce reasons for such a well-settled rule, it may be worthwhile to state the most important ones. To allow immediate review on the denial of a motion to quash a subpoena may produce an appeal that otherwise would not occur, since the case may be settled, or the party proposing to call the witness or the witness himself may have second thoughts. Also, as illustrated by this case, postponing the appeal until the witness had placed himself in contempt would normally provide the appellate court with a record of just what questions the witness had been asked and refused to answer which is generally unavailable on the denial of a motion to quash." 539 F.2d at 814-15 n.3.

Our recent Maryland cases of *In re Special Investigation No. 244,* 296 Md. 80, 459 A.2d 1111 (1983); *In re Special Investigation No. 231,* 295 Md. 366, 455 A.2d 442 (1983); and *In re Special Investigation No. 185,* 293 Md. 652, 446 A.2d 1151 (1982), all are distinguishable from the case at bar. In the procedural posture of those cases the only matter before the trial court was the motion to quash. In each of those

cases the motion to quash was a separate proceeding. None of those motions was filed in the proceeding out of which the subpoena emanated. No criminal case was then extant. The only case pending was the motion to dismiss.

The other cases upon which Sigma relies, *News American v. State,* 294 Md. 30, 447 A.2d 1264 (1982), and *Randall Book Corp. v. State,* 49 Md. App. 131, 430 A.2d 624, *cert. denied,* 291 Md. 780 (1981), are distinguishable on their facts.

We hold that ordinarily an order denying a motion to quash a subpoena duces tecum in a pending case is not an appealable final order. Hence, it follows that the appeal here must be dismissed.

## III

Despite the fact that we conclude that this appeal must be dismissed, we shall address the issue presented. We do this in the interest of judicial economy. Precedent for our so doing exists. *See, e.g., In re Special Investigation No. 244,* 296 Md. at 83; *Equitable Tr. Co. v. State Comm'n,* 287 Md. 80, 89, 411 A.2d 86 (1980); *Kardy,* 237 Md. at 534-35; *Lee,* 161 Md. at 434.

The nature of the defense of necessity is explained by W. LaFave & A. Scott, Jr., *Criminal Law* § 50 (1972):

> "One who, under the pressure of circumstances, commits what would otherwise be a crime may be justified by 'necessity' in doing as he did and so not be guilty of the crime in question. With the defense of necessity, the pressure must come from the physical forces of nature (storms, privations) rather than from other human beings. (When the pressure is from human beings, the defense, if applicable, is called duress rather than necessity.) Also, the pressure must operate upon the mind of the defendant rather than upon his body. (When **A** and **B** are standing atop a precipice, and an earthquake causes **A** to stumble against **B,** throwing **B** over the cliff to his death, **A**'s defense to a homicide charge

is not that of necessity, for **A**'s mind did not will his body against **B**'s; instead, his defense is that he did no 'act' (a willed movement), and one cannot be guilty of a crime of action without an act.) But when **A**, starving to death, takes and eats **B**'s food to save his own life, or when **A** in an emergency intentionally kills **B** to save **C** and **D**, he may be eligible for the defense of necessity.

"The rationale of the necessity defense is not that a person, when faced with the pressure of circumstances of nature, lacks the mental element which the crime in question requires. Rather, it is this reason of public policy: the law ought to promote the achievement of higher values at the expense of lesser values, and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law. The law forbids stealing and murder, for there are positive values in the right to property and the right to life; but (as in the case of the starving man) it is better to save a life than to save the property, and (in the case of the killing of **B** to save **C** and **D**) it is better that two lives be saved and one lost than that two be lost and one saved.

"The matter is often expressed in terms of choice of evils: When the pressure of circumstances presents one with a choice of evils, the law prefers that he avoid the greater evil by bringing about the lesser evil. Thus the evil involved in violating the terms of the criminal law (taking another's property; even taking another's life) may be less than that which would result from literal compliance with the law (starving to death; two lives lost)." *Id.* at 381-82.

*See also* 1 *Wharton's Criminal Law* § 88 (13th ed. 1972); R. Perkins, *Criminal Law* 956-61 (2d ed. 1969); Arnolds & Garland, *The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil,* 65 J. Crim. L. &

Criminology 289 (1974). Professor Perkins refers to "Necessity" as "Duress of Circumstances." He opens his discussion by stating:

"If a choice exists but only between two evils, one of which is the commission of a prohibited act, and the emergency was not created by the wrongful act of any other person it is spoken of as an act done in a case of necessity. This does not apply where there is no choice, and hence no act, as where **A** is swept off his feet by a tornado and dashed against **B**, resulting in serious injury to the latter. The injury to **B** was unavoidable but it was not the result of an act done through necessity since **A** did not act but was 'acted upon' by the tornado." *Id.* at 956 (footnote omitted).

Messrs. Arnolds and Garland state:

"The cases and the literature suggest three essential elements of the defense of necessity: (1) the act charged was done to avoid a significant evil; (2) there was no other adequate means of escape; and (3) the remedy was not disproportionate to the evil to be avoided." *Id.* at 294.

LaFave & Scott list five elements necessary to consider before applying the defense of necessity:

1 — The harm avoided — this need not be physical harm but also may be harm to property as, for instance, where a firefighter destroys some property to prevent the spread of fire which threatens to consume other property of greater value.

2 — The harm done — this is not limited to any particular type of harm but includes intentional homicide as well as intentional battery or property damage. An illustration is supplied:

"[A]s where **A**, driving a car, suddenly finds himself in a predicament where he must either run down **B** or hit **C**'s house and he reasonably chooses the latter, unfortunately killing two people in the house who by bad luck happened to be just at that place inside the house where **A**'s car struck — it is the harm-reasonably-expected, rather than the harm-actually-caused, which governs." *Id.* at 386.

3 — Intention to avoid harm — to have the defense of necessity, the defendant must have acted with the intention of avoiding the greater harm. Actual necessity, without the intention, is not enough. However, an honest and reasonable belief in the necessity of his action is all that is required.

4 — The relative value of the harm avoided and the harm done. The defendant's belief as to the relative harmfulness of the harm avoided and the harm done does not control. It is for the court, not the defendant, to weigh the relative harmfulness of the two alternatives. To allow the defense the court must conclude that the harm done by the defendant in choosing the one alternative was less than the harm which would have been done if he had chosen the other.

5 — Optional courses of action; imminence of disaster. The defense of necessity applies when the defendant is faced with this choice of two evils: he may either do something which violates the literal terms of the criminal law and thus produce some harm, or not do it and so produce a greater harm. If, however, there is open to him a third alternative, which will cause less harm than will be caused by violating the law, he is not justified in violating the law. For example, "[a] prisoner

subjected to inhuman treatment by his jailors is not justified in breaking prison if he can bring about an improvement in conditions by other means." *Id.* at 388.

This final point is reiterated in 21 Am. Jur. 2d *Criminal Law* § 147 (1981), where it is stated, "The case does not become one of necessity unless all other alternatives have been exhausted." *Id.* at 283 (footnote omitted).

We have not previously considered the defense of necessity. The Court of Special Appeals, however, considered it in *Frasher v. State,* 8 Md. App. 439, 260 A.2d 656, *cert. denied,* 400 U.S. 959 (1970), and *Robinson v. State,* 42 Md. App. 617, 402 A.2d 115 (1979).

In *Frasher* the court found necessity to be a valid defense in criminal prosecutions where applicable. The defendant in that case sought to contest the voluntariness of his criminal acts by raising the defense of necessity. Recognizing that "it is a defense as to all crimes except taking the life of an innocent person that the defendant acted under a compelling force of coercion or duress," the court went on to point out that the two types of compulsion that exist are "necessity, that is duress arising from circumstances, [and] the application of duress on the defendant by another person." 8 Md. App. at 447-48. The court quoted R. Perkins, *Criminal Law* at 847 (1957) which said, "If a choice exists but only between two evils, one of which is the commission of a wrongful act, and the emergency was not created by the wrongful act of another person it is spoken of as an act done in a case of necessity." *See* 8 Md. App. at 448. Similar language is found today in Perkins, *supra,* at 956. Judge Orth went on to say for the court:

"This doctrine applies not only to the obvious situation when the act done was necessary, or reasonably seemed to be necessary, to save life or limb or health, . . . but also where the act was not of particular gravity and the danger or apparent danger to be avoided was less serious in its nature. So courts have recognized necessity as an excuse where, for example, a person is unavoidably caught in a traffic

> jam, holding that he is not guilty of violating the
> law which prohibits stopping at that place; and a
> vessel is not liable for a violation of the embargo
> laws where, during a legitimate voyage, she is
> obliged by stress of weather to take refuge in a
> proscribed port. See *Perkins, supra,* at 848; *Clark &
> Marshall, Law of Crimes,* (6th Ed.), § 5.15, p. 324."
> 8 Md. App. at 448.

The court found that the doctrine of necessity did not apply in *Frasher* since the defendant was charged with possession and control of heroin and as the court stated "in a prosecution for an offense not requiring intent, as are the offenses here, the defense of necessity is not available, at least where the defendant could have avoided the emergency by taking advance precautions." 8 Md. App. at 448-49 (citations omitted).

In *Robinson,* 42 Md. App. 617, the court applied the defenses of necessity and duress to a defendant charged with the crime of escape, considering the two defenses "interchangeabl[e]" in those cases. 42 Md. App. at 619. The court there adopted the five requirements set forth in *People v. Lovercamp,* 43 Cal. App. 3d 823, 118 Cal. Rptr. 110, 115 (1974), as necessary to be present in order for necessity to be a valid defense to the crime of escape. These requirements have only been applied in escape cases. *See Craddock v. State,* 47 Md. App. 513, 424 A.2d 168 (1981).

The Supreme Court has discussed the necessity defense and while doing so with regard to an escape conviction the Court did not apply the rule in *Lovercamp* but rather considered the general rules of the defense. *United States v. Bailey,* 444 U.S. 394, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980). The Court noted that the present case law blurs the distinction between the defenses of necessity and duress. It pointed out that the underlying principle for both is "if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail." 444 U.S. at 410, quoting LaFave & Scott, *supra,* § 49 at 379. This quotation

from LaFave & Scott comes from their section on the defense of duress. These authors do find a distinction between necessity and duress defenses. We have already quoted their comments to the effect that with the defense of necessity the pressure must come from the physical force of nature rather than from other human beings; that the rationale behind the defense is not that a person when faced with the pressure of circumstances lacks the mental element which the crime in question requires, but rather that the law ought to promote the achievement of higher values at the expense of lesser values; and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law. *Id.* at 381-82.

As stated previously, in the present case Braun bases her necessity defense on two claims — (1) her entry into the clinic was made "to save the lives of the unborn"; and (2) "to counsel the pregnant women who planned to have abortions in an effort to dissuade them from risking what she believed to be an unnecessarily dangerous medical procedure." Yet her actions also may be described as a protest of the activities of the clinic. Although abortion is constitutionally protected under *Roe v. Wade,* 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), it still is abhorred by a sizeable percentage of the population, being viewed as morally objectionable.

Across the country several cases have been reported dealing with the use of the defense in cases involving controversial moral issues of the day including those dealing with trespass on abortion clinics as in the present case. In fact, enough has been reported on the latter subject to support a law review article. *See* Note, *Necessity as a Defense to a Charge of Criminal Trespass in an Abortion Clinic,* 48 U. Cin. L. Rev. 501 (1979). The consensus is that necessity is not a valid defense for criminal trespass charges involving political or moral protest, particularly those involving abortion clinics.

One of the earliest and most prominent protest cases involving the defense is *State v. Marley,* 54 Hawaii 450, 509

P.2d 1095 (1973). The defendants there trespassed on private property in an attempt to stop what they conceived to be "war crimes" of a defense contractor. The court ruled, however, that the defense does not apply to such protest actions. The court said:

"The defense is not effective in the following situations:

"(1) Where there is a third alternative available to defendants that does not involve violation of the law, defendants are not justified in violating the law. [Citations omitted.] Other forms of noncriminal protest were and are available to defendants to enable them to dramatize, and hence hopefully terminate, conduct which they may view are harmful.

"(2) A closely related required element is that the harm to be prevented be imminent. Where, as here, the harmful acts to be prevented by defendants' actions were, at best, only tenuously connected with the situs of the crime, and would be only tenuously affected by defendants' acts, we cannot find any real 'necessity' for defendants to act.

"(3) Thirdly, and most importantly, ... defendants remain unentitled to the defense of 'necessity' because their actions were not reasonably designed to actually prevent the threatened greater harm.... Under any possible set of hypotheses, defendants could foresee that their actions would fail to halt Honeywell's production of the war material, the production of which defendants assert to be a war crime. Since no reasonable man could find otherwise, it was not error for the judge to have omitted an instruction on the 'necessity defense'." 54 Hawaii at 472-73.

More recently the District of Columbia Court of Appeals considered the defense in relation to charges of criminal

trespass involving a moral issue. *Griffin v. United States,* 447 A.2d 776 (D.C. 1982), *cert. denied,* 103 S. Ct. 1879 (1983). In that case the defendants and others entered two cathedrals on a winter night, as the court put it, "for the express purpose of opening the doors of these buildings to homeless persons living in Washington, D.C., to protect them with shelter for the night." 447 A.2d at 777. The trial court refused to allow the defendants to present the necessity defense. The Court of Appeals upheld the decision. The court applied the three elements of *Marley,* 54 Hawaii 450, — there was a legal alternative, there was no imminent harm to the defendants, and the actions were not designed to actually prevent greater harm. The court stated:

> "Appellants' motion makes clear that their actions were designed to focus attention on the plight of the homeless; they were not undertaken as a last resort, after all else had been attempted, to avoid an immediate harm. Therefore, their motion was properly denied." 447 A.2d at 778.

Five cases have dealt with the legitimacy of the necessity defense against charges of criminal trespass on abortion clinics. All find this defense not to be a proper one. *Cleveland v. Municipality of Anchorage,* 631 P.2d 1073 (Alaska 1981); *Gaetano v. United States,* 406 A.2d 1291 (D.C. 1979); *People v. Stiso,* 93 Ill. App. 3d 101, 416 N.E.2d 1209 (1981); *People v. Krizka,* 92 Ill. App. 3d 288, 416 N.E.2d 36 (1980); *City of St. Louis v. Klocker,* 637 S.W.2d 174 (Mo. App. 1982).

In *Cleveland* the appellants claimed that when they attempted to prevent the performance of abortions at a clinic they acted with a reasonable belief that their actions were necessary to protect human life from imminent peril. The Alaska Supreme Court quoted from appellants' brief which stated:

> " '[T]hese appellants . . . were not protesting abortion in general, or engaging in symbolic acts which they hoped would lead the public to sympathize with the prolife cause. Rather, they were directly

intervening to protect the particular human lives threatened with imminent destruction at Alaska Hospital and Clinic in the abortion chambers they entered, on that very day.' " 631 P.2d at 1077.

In considering the defense of necessity the Supreme Court of Alaska recognized the three elements referred to by Arnolds and Garland in their article on the defense, that "1) [t]he act charged must have been done to prevent a significant evil; 2) there must have been no adequate alternative; 3) the harm caused must not have been disproportionate to the harm avoided." 631 P.2d at 1078 (footnote omitted). The court went on to say:

"[The defense of necessity] is available if the accused reasonably believed at the time of acting that the first and second elements were present, even if that belief was mistaken; but the accused's belief will not suffice for the third element. An objective determination must be made as to whether the defendant's value judgment was correct, given the facts as he reasonably perceived them." 631 P.2d at 1078.

The court in its analysis, although stating that "the 'necessity' behind the charged act must generally be a result of the 'physical forces of nature,' " noted that it did not disagree with the expansion of the necessity defense to encompass human threats when limited to cases in which the threatened man-made harm is illegal. *Id.* It pointed out that generally when the threatened harm emanates from a human source, an actor who violates the law in response to it can defend only on the grounds of duress, defense of others, or crime prevention. It said, "The defense of duress is clearly inappropriate here since appellants do not claim that their illegal acts were compelled by 'the unlawful threats of another.' " 631 P.2d at 1078-79. It pointed out that the other two related defenses — defense of others and crime prevention — require that the harm avoided by the charged act be unlawful. However, abortion was conceded to be

lawful in Alaska. The court went on to apply the test in *Marley,* 54 Hawaii 450. The Alaska court said:

"As in the present case, the *Marley* defendants' behavior was nonviolent but was disruptive of normal business operations. *Id.,* at 1099. Their necessity defense was rejected for three reasons, two of which we find applicable here: first, '[w]here there is a third alternative available to defendants that does not involve violation of the law, defendants are not justified in violating the law. Other forms of non-criminal protest were and are available to defendants to enable them to dramatize, and hence hopefully terminate, conduct which they may view [as] harmful.' ... Second, defendants are 'unentitled to the defense of "necessity" because their actions were not reasonably designed to actually prevent the threatened greater harm. ... Under any possible set of hypotheses, defendants would foresee that their actions would fail to halt' the practices to which they objected. *Id.*" 631 P.2d at 1079 (brackets in original).

At one point the court observed, "This was simply not the kind of emergency situation contemplated by the defense of necessity." 631 P.2d at 1080. Finally, the court said:

"We hold that the trial court's rejection of appellants' necessity defense was proper. We are in agreement with the District of Columbia Court of Appeals' response to the necessity defense raised by participants in a similar anti-abortion demonstration:

Unlike medical necessity or other emergency situations, the necessity cited by appellants cannot shield them from criminal liability for their acts.

The rights to free speech, to assembly, and to petition the government for grievances are a cornerstone of the American system. So, too, is

the right to be free from criminal interference. These appellants trespassed on the rights of others and did so without excuse.

*Gaetano v. United States,* 406 A.2d 1291, 1295 (D.C. App. 1979)." 631 P.2d at 1081-82.

In *Gaetano,* 406 A.2d 1291, the defendants staged a "sit in" at a private abortion clinic. At one point they chained themselves to treatment tables. At their trial on trespassing charges they attempted to raise, among other defenses, that of necessity. The District of Columbia Court of Appeals rejected this defense, concluding its opinion with that which we have just quoted in *Cleveland.*

In *Krizka,* 92 Ill. App. 3d 288, the defendants entered a medical center which performed abortions. As the court put it,

> "Defendants believed they would save the fetuses by peaceably interposing themselves between females seeking abortions and the officers, agents and servants of the Center who would perform the abortions. As a result of defendants' conduct, although a number of females seeking abortions entered the premises, none of them entered the area in which abortions were performed." 92 Ill. App. 3d at 289.

Illinois has a statute permitting the necessity defense if the accused was without blame in occasioning or developing a situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct. In response to a contention by the defendants that they had to commit the acts of criminal trespass in order to prevent the deaths of fetuses which they perceive is a greater injury, the court said, "[T]he 'injury' prevented by the acts of criminal trespass is not a legally recognized injury." 92 Ill. App. 3d at 290. The court further said:

"We therefore conclude that defendants did not engage in illegal conduct because they were faced with a choice of evils. Rather, they intentionally trespassed on complainant's property in order to interfere with the rights of others. Clearly, this situation does not present the circumstances envisioned by the necessity statute. Moreover, defendants' argument that the decision in *Roe* is not applicable here because that case relies on the Fourteenth Amendment, which prohibits actions by the States, not individuals, is without merit. The argument ignores the fact that defendants' convictions did not arise from the violation of the constitutional rights of pregnant women, but rather, were the result of defendants' acts of criminal trespass. Under *Roe,* an abortion during the first trimester of pregnancy is not a legally recognizable injury, and therefore, defendants' trespass was not justified by reason of necessity." 92 Ill. App. 3d at 290-91.

In *Stiso,* 93 Ill. App. 3d 101, defendants were arrested inside the Albany Clinic in Chicago after they sought to bar access to rooms where abortions were performed. The trial court barred them from raising the defense of necessity. The Illinois Court of Appeals said:

"We find the determination in *Krizka* to be controlling here. It is clear that the very activity labelled an injury by defendants and sought to be prevented has been afforded legal protection by the United States Supreme Court. It would be unreasonable under these circumstances to so construe the Illinois necessity statute as to provide these defendants, and others sharing similar personal beliefs, with protection from conviction for crimes committed in derogation of this protected right." 93 Ill. App. 3d at 103.

*Klocker,* 637 S.W. 2d 174, is the most recent case. The accused entered an abortion clinic just as the facility was opening, intending to prevent the abortions scheduled to be performed that day. At their trial on charges of trespassing they raised the defense of necessity. This was rejected by the trial court. On appeal the court applied the rationale of *Cleveland,* 631 P.2d 1073. The defense of necessity has been codified in Missouri as an affirmative defense. The statute provides that conduct which would otherwise be a crime is justifiable " 'when it is necessary as an emergency measure to avoid an imminent public or private injury' and the injury 'is of such gravity that, according to ordinary standards of intelligence and morality, the desirability of avoiding the injury outweighs the desirability of avoiding the injury sought to be prevented by the statute defining the crime charged.' " 637 S.W.2d at 176. The court said for the statute to be applicable "the criminal conduct pursued by a defendant must be pursued to avoid an 'imminent public or private injury.' Without a threatened injury, there is no justification for a defendant's otherwise criminal conduct." *Id.* The court said:

> "Normally, a public or private injury, when caused by a human being, presupposes the actionable invasion of some right. No actionable invasion of rights occurs in legally protected activity. Therefore, the statutory terminology — a public or private injury — would not contemplate legally protected activity. Moreover, whatever construction is placed upon this terminology, no sensible construction would permit the terminology to include legally protected human activity, for protected activity, in the legal sense, causes no injury. In *Roe v. Wade,* 410 U.S. 113, 153, 93 S. Ct. 705, 726, 35 L. Ed. 2d 147 (1973), the Supreme Court of the United States recognized that a woman's decision to abort her pregnancy is protected by her constitutional right to privacy. Since abortions, like those in issue here, are constitutionally protected activity and, therefore,

legal, their occurrence cannot be a public or private injury." 637 S.W.2d at 176-77 (footnote omitted).

The court also cited *Stiso,* 93 Ill. App. 3d 101, and *Krizka,* 92 Ill. App. 3d 288.

As stated above, in the present case Braun has justified her allegedly illegal actions on two bases. First, she claims she was attempting to protect the lives of the unborn. Secondly, she asserts she was attempting to protect the lives of patients from dangerous practices at the clinic. As can be seen from the cases we have reviewed, the former argument has been rejected by each court which has considered the matter. The second argument is unique, apparently not having been raised before. Yet it, too, fails the defense of necessity test. There are in fact alternative methods for dealing with incompetent treatment by physicians. *See, e.g.,* Code (1981) §§ 14-501 to -512, Health Occupations Article, pertaining to disciplinary actions against physicians. If Braun has reason to believe that violations of established procedures are taking place, the machinery exists to adjudicate her complaint. *See, e.g., Comm'n on Med. Discipline v. Stillman,* 291 Md. 390, 435 A.2d 747 (1981); *Unnamed Physician v. Comm'n,* 285 Md. 1, 400 A.2d 396, *cert. denied,* 444 U.S. 868 (1979). She has offered no factual evidence of her claim of incompetent treatment at the clinic. Although she now attempts by her subpoena duces tecum to establish such a claim, it would appear that at the time of her criminal acts there was no justification for her actions. Rather her activities constituted protest. Thus, they are not protected by the necessity defense.

It should be noted that the practices at the clinic posed no immediate harm to Braun personally. Also, there was a "legal" alternative available to her that would have been as effective, if not more so, in protecting the public from what she views as dangerous treatment by the clinic. Braun could have handed out relevant information on the public street at the entrance to the clinic to those patients of the clinic entering its facilities warning them of the potential dangers. This would have risked no criminal charges. Certainly such

activity would have served her purposes better than her physical removal from the clinic.

The statement by the District of Columbia Court of Appeals in *Gaetano,* 406 A.2d 1291, quoted by the Alaska court in *Cleveland,* 631 P.2d 1073, is applicable here:

> "Unlike medical necessity or other emergency situations, the necessity cited by appellants cannot shield them from criminal liability for their acts.
>
> "The rights to free speech, to assembly, and to petition the government for grievances are a cornerstone of the American system. So, too, is the right to be free from criminal interference. These appellants trespassed on the rights of others and did so without excuse." 406 A.2d at 1295.

The defense of necessity is not applicable to this case. Because the subpoena was predicated upon that defense it follows that the subpoena should have been quashed.

*Appeal dismissed; appellee Debra Braun to pay the costs.*